Robert S. Freund (SBN 287566)
ROBERT FREUND LAW
10866 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024
Telephone: (323) 553-3407
Email: robert@robertfreundlaw.com

Attorneys for Defendant,
TSC Acquisition Corporation

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA—WESTERN DIVISION

| | |
|---|---|
| TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA,<br><br>             Plaintiff,<br><br>v.<br><br>TSC ACQUISITION CORP.,<br><br>             Defendant. | CASE NO.  2:19-cv-03863 PA-SK<br><br>**DECLARATION OF NATHAN JOHNSON IN SUPPORT OF DEFENDANT TSC ACQUISITION CORPORATION'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>DATE:       May 18, 2020<br>TIME:       1:30 p.m.<br>CTRM:      9A<br><br>[Concurrently filed with Opposition; Separate Statement of Genuine Issues; Evidentiary Objections; Declarations of David Wilder and Robert S. Freund]<br><br>Judge:       Hon. Percy Anderson<br><br>Action Filed:    May 3, 2019<br>Trial Date:      July 21, 2020 |

## DECLARATION OF NATHAN JOHNSON

I, Nathan Johnson, declare under penalty of perjury under the laws of the United States and the State of California as follows:

1.      At all relevant times, I served and currently serve as the co-Chief Executive Officer of TSC Acquisition Corp. ("Company").  In this capacity, I oversee all aspects of TSC's operations, including the LifeLine program, along with my brother, co-CEO Matthew Johnson. I am familiar with the matters set forth in Travelers' Complaint and TSC's efforts to secure workers compensation policies, the various audits, and issues relating to the same. I am familiar with and had access to the workers compensation insurance policies issued to TSC Acquisitions Corp. ("TSC") in 2014 and 2015, the terms and conditions contained therein, and claims filed thereunder. I hold an M.B.A. from the Wharton School of Business, an M.A. in International Studies from the Lauder Institute at the University of Pennsylvania and received my B.A. from Bucknell University. I have over 25 years of telecommunications industry and turnaround operational experience.

### TSC Provides LifeLine Services to Low-Income Californians

2.      TSC is located in Los Angeles and does not have any other offices in California or the United States. TSC has been in Los Angeles since 2006, and at the same address until 2014, when it moved to downtown Los Angeles. Attached hereto as **Exhibit F** is a true and correct copy of TSC's statement of information designating the TSC office location in Los Angeles, California.

3.      TSC is a service provider of the California and federal LifeLine programs, providing subsidized wireless phone service for lower-income Californians. TSC purchases access to transmission services from wireless carriers and distributes this access to qualified participants of the LifeLine program. TSC is then reimbursed for this access by the government with funds raised through state and federal taxation, which are specifically designated for the LifeLine program. As such, all of TSC's income is derived from both state (California) and federal taxes.

1

JOHNSON DECLARATION IN SUPPORT OF TSC'S OPPOSITION TO MSJ

4.      TSC does not collect any money from its customers and has no internal mechanism in which to collect (and no such mechanism is required by the LifeLine program). In other words, TSC's LifeLine customers receive *free* monthly service, *free* airtime each month, and a *free* handset. TSC does not conduct any sales transactions of any kind and never collected a single penny from any of the thousands of participants TSC qualifies for this vital public service at any point in the LifeLine program cycle.

5.      Further, LifeLine service is not a "prepaid" service.  So, unlike prepaid services, LifeLine customers do not pay in advance for their monthly allotment of LifeLine-supported service either (typically, 250 minutes per month). Simply put, TSC LifeLine customers never pay for any part of the entire monthly LifeLine benefit.  As such, there is no collection of any amount from the customer, and no bill is rendered to the customer for LifeLine service. Attached hereto as **Exhibit G** is a true and correct copy of General Order 153 issued by the California Public Utilities Commission establishing California Lifeline – wireless program), available at https://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Utilities_and_Industries/Communications_-_Telecommunications_and_Broadband/Consumer_Programs/California_LifeLine_Program/154648[1].pdf.

6.      At present, TSC has multiple "satellite offices" that serve as a point of contact for low-income Californians to register and qualify for the program, and then get a phone number and telephone. Again, no sales transactions are conducted at any of these locations. All employees at these locations serve as customer service representatives of the LifeLine program and not sales agents. Therefore, it cannot be said that TSC has any retail or outside sales employees and any such classification would be incorrect.

## The Travelers 2014 and 2015 Policies

7.      I have overseen every stage of the insurance acquisition process and engaged in dozens of insurance audits. TSC is owned 100% by me and my brother, co-

2

CEO Matthew Johnson.

8.     In 2013, TSC had acquired both Sage Telecom, Inc. ("Sage") and TruConnect Mobile LLC ("TruConnect Mobile") out of Dallas, Texas (collectively, Sage and TruConnect Mobile are referred to herein as "Sage"). These companies were acquired by my brother and me because of various assets we wanted to roll up into our California operating entity, Telscape Communications, Inc., which would later become TruConnect Communications, Inc. The Sage companies were wholly owned subsidiaries of TSC. As such, Sage did not have any visibility, access, knowledge or comprehension of how TSC was managing the financials related to the merger of these various entities or the consolidated books of TSC. To illustrate my lack of trust in the Sage executives, TSC later sued the founding team derivatively at Sage for fraud, financial malfeasance and gross negligence, among other claims.

9.     In other words, my brother and I were effectively the chief financial officers of the enterprise from 2012 to 2015 because we were intimately involved in every aspect of the companies at that time.

10.     During that time, I caused TSC to acquire two workers compensation insurance policies from Travelers to TSC. The first policy, Policy No. HJUB-4F12803-3-14, had an effective period of December 31, 2014 to December 31, 2015 (the "2014 Policy").

11.     The second policy, Policy No. HJUB-7114P39-6-15, had an effective period of December 31, 2015 to December 31, 2016 (the "2015 Policy").

12.     The initial policy premium for the 2014 Policy was $69,256, and the initial policy premium for the 2015 Policy was $49,060. Despite my repeated inquiries, even throughout the course of this litigation, Travelers never provided an explanation beyond say-so conclusions for why the audited premiums increased from 2014 to 2015.

13.     It was not until I reviewed the Declaration of Nerissa Soufi in support of Travelers' motion for summary judgment that I learned that Travelers used purported payouts of over $5,000,000 as the basis for the experience modifier, resulting in

3

Travelers incorrectly doubling the 2014 Policy premium.

**The 2014 Policy Audit**

14.     In 2016, the vast majority of the Sage offices were purged, and only a few employees remained after the liquidation. At the time, the TSC offices would assign various duties to the team remaining in Dallas, Texas. I received and reviewed an email from Sage financial consultant Christian Gonzales informing me that Travelers was seeking to sit down and conduct an audit of the 2014 Policy.

15.     I was not aware of any specific meeting that took place in Dallas until July 7, 2016, when we received the notice of audit adjustment sent to TSC's offices.  It was not until receiving that notice that I learned that Mr. Kalinowsky had visited Dallas and met with two of the remaining Sage employees – excluding Christian Gonzales, who was out on bereavement leave at the time.  Attached hereto as **Exhibit H** is a true and correct copy of Mr. Gonzales's paystubs around the period during which Mr. Kalinowski claims to have met with Mr. Gonzales, showing that Mr. Gonzales was on leave for bereavement and took paid time off.

16.     The fact that Travelers met with Sage officials concerned me greatly for reasons I mentioned above in paragraph 8 – i.e., that nobody at Sage had the consolidated books with the correctly accounted end-of-the-year payroll that would serve as part of the financial audit.  I was worried, in part, that Sage provided inflated numbers based on an employee base that no longer existed, and did not have any idea of what the California LifeLine program was and how it worked, and that would result in an audit that increased the overall premium. I was concerned that Sage executives would believe that the LifeLine wireless program TSC provides in California is the same as the landline services being offered by Sage in Texas. Therefore, I was concerned that Sage officials may mistakenly believe the transactions and subsidization happened the same way in both states (i.e., as between lifeline landline in Texas versus lifeline wireless in California).

17.     My concerns proved to be warranted.  In reviewing the July 7, 2016 audit

4

notice, I discovered some immediate issues. First, Travelers reclassified employees from clerical to retail or outside sales. As mentioned previously, TSC does not sell any products or services and does not conduct any sales transactions with Lifeline participants. As such, the original clerical employee designation still applied. Second, some unrelated reclassifications were also incorrect. Third, the fact that the audit resulted in an *increase* of the premium, when we eliminated half the work force in Dallas, Texas did not make sense to me. The number naturally should have gone down – leading me to believe whatever financial information that Sage provided Travelers was incorrect and resulted in a flawed audit.

18.     On or about August 24, 2016, I met with the TSC financial team to discuss the audit. At the time, I understood that everyone at TSC was caught off-guard by the adjustment notice, and my finance team informed me that the Sage office provided underlying documents and was handling the audit. I agreed with my finance team that any reclassifications were incorrect and that the payroll calculations seemed improperly high. As such, I personally instructed my then general counsel, Nathaniel Law, to challenge the 2014 audit for the reasons set forth above. Specifically, I requested that he obtain all the "homework" that Travelers conducted in its audit so I could review with the TSC financial team that my brother and I managed.

19.     On September 13, 2016, at my request, Nathaniel Law disputed the 2014 audit with Travelers. Attached hereto as **Exhibit I** is a true and correct copy of the September 13, 2016-November 28, 2016 email exchange between Nathaniel Law and Travelers' Dispute Resolution Specialist.

20.     I did not, and never have, agreed to pay the 2014 Policy audit and have made sure all of my employees disputed the same at every opportunity. My review of the email records in connection with this litigation refreshed my recollection regarding the numerous times TSC disputed the 2014 Policy audit in writing to Travelers. Indeed, even the revised billing summaries sent to us from Travelers after the revised 2014 Policy audit took place would incorrectly state what the purported "balance" was on the

5

account (e.g., Travelers would conflate the $53,353 number with the $61,837 number in its communications to the TSC financial team).

21.     In October 2016, I was asked by TSC's controller, Wendy Mendoza, if a payment should be made against to either of the 2014 or 2015 Policies. At this time, we were arguing vehemently with Travelers, and both sides were threatening "next steps" if a resolution wasn't reached. As such, I agreed that it would be a sign of good faith to make some payment towards the purported balance to keep the lines of dialogue open.  I figured that, at worst, Travelers would finally show us their homework, TSC could advise on how the reclassifications were wrong and provide the accurate payroll information, then conceivably this money would come back or serve as a credit on a later policy premium. As such, I approved payments from time to time – but it was in no way intended to reflect TSC's acquiescence or some waiver of objections regarding the revised 2014 Policy audit. Indeed, as set forth in Exhibit C of Gauntlett's Declaration, which is an email exchange between Travelers and Mr. Wilder, in which Travelers sends a demand for payment on both outstanding policies, it appears it was Travelers that applied those funds to the 2014 Policy and not TSC.

## 2015 Policy Audit

22.     On October 2017, TSC received notice of the 2015 Policy audit. It appeared that Travelers was once again communicating with Sage employees and not TSC employees – and this time to *terminated* employees.  As such, as set forth in Exhibit B of Mr. Wilder's Declaration, it took almost a year for the email from Travelers regarding the 2015 Policy audit to work its way to TSC.

23.     When I reviewed the 2015 Policy, as with the 2014 Policy, the numbers were completely incorrect.  Employees were misclassified as retail sales and outside sales, moved to other nonsensical classifications, and executive salaries appeared to be added to the TSC books when they should have been capped or eliminated altogether. As such, I demanded my interim-Chief Financial Officer, David Wilder, to immediately challenge the 2015 Policy audit, and even re-initiate the 2014 Policy audit to the extent

6

that matter was still outstanding.

24.     The standing order from me to the entire TSC staff at this time was that both the audits were being disputed, that no more money should be paid towards either adjusted premiums, because TSC had already paid more than the equivalent of both original Policy premiums.  I instructed Mr. Wilder and the rest of the team to aggressively dispute the results and file a legal action if necessary.  As such, Mr. Wilder started his campaign to dispute the audits (with Travelers directly and its collection agents) detailed in his declaration filed concurrently herewith. Mr. Wilder would keep up to date with the audit disputes from time-to-time via in-person meetings, emails or telephone calls.


I declare under penalty of perjury of the laws of the United States and the State of California that the foregoing is true and correct.  Executed on this 27th day of April, 2020 at Los Angeles, California.


_/s/ Nathan Johnson_
Nathan Johnson

JOHNSON DECLARATION IN SUPPORT OF TSC'S OPPOSITION TO MSJ

# EXHIBIT F



**F**

# State of California
## Secretary of State

### Statement of Information
**(Foreign Corporation)**
**FEES (Filing and Disclosure): $25.00.**
**If this is an amendment, see instructions.**
**IMPORTANT – READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

1. **CORPORATE NAME**

2. **CALIFORNIA CORPORATE NUMBER**

This Space for Filing Use Only

**No Change Statement**  (Not applicable if agent address of record is a P.O. Box address.  See instructions.)

3. **If there have been any changes to the information contained in the last Statement of Information filed with the California Secretary of State, or no statement of information has been previously filed, this form must be completed in its entirety.**

☐ If there has been no change in any of the information contained in the last Statement of Information filed with the California Secretary of State, check the box and proceed **to Item 13.**

**Complete Addresses for the Following**  (Do not abbreviate the name of the city.  Items 4 and 5 cannot be P.O. Boxes.)

| | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 4.   STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE | | | |
| 5.   STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIFORNIA, IF ANY | CITY | STATE | ZIP CODE |
| 6.   MAILING ADDRESS OF THE CORPORATION, IF DIFFERENT THAN ITEM 4 | CITY | STATE | ZIP CODE |

**Names and Complete Addresses of the Following Officers**  (The corporation must list these three officers.  A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 7.   CHIEF EXECUTIVE OFFICER/ | ADDRESS | CITY | STATE | ZIP CODE |
| 8.   SECRETARY | ADDRESS | CITY | STATE | ZIP CODE |
| 9.   CHIEF FINANCIAL OFFICER/ | ADDRESS | CITY | STATE | ZIP CODE |

**Agent for Service of Process**  If the agent is an individual, the agent must reside in California and Item 11 must be completed with a California street address, a P.O. Box address is not acceptable.  If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 11 must be left blank.

10.  NAME OF AGENT FOR SERVICE OF PROCESS

11.  STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, **IF AN INDIVIDUAL**  CITY        STATE     ZIP CODE

**Type of Business**

12.  DESCRIBE THE TYPE OF BUSINESS OF THE CORPORATION

13.  THE INFORMATION CONTAINED HEREIN IS TRUE AND CORRECT.

| DATE | TYPE/PRINT NAME OF PERSON COMPLETING FORM | TITLE | SIGNATURE |
|---|---|---|---|

SI-350 (REV 01/2013)                                                                APPROVED BY SECRETARY OF STATE

# EXHIBIT G

# GENERAL ORDER 153

## Public Utilities Commission of the State of California
### PROCEDURES FOR ADMINISTRATION OF
### THE MOORE UNIVERSAL TELEPHONE SERVICE ACT
### (CALIFORNIA LIFELINE PROGRAM)
### GENERAL ORDER

1. GENERAL

   1.1   Intent – The purpose of this General Order is to implement the Moore Universal Telephone Service Act [AB 1348, Ch. 1143, Stats. 1983, California Public Utilities Code §871 et seq.]. The Act is intended to provide low-income households with access to affordable basic residential telephone service.

   1.2   Applicability – This General Order is applicable to all California LifeLine Service Providers operating in California and to residential customers eligible for California LifeLine furnished pursuant to the Moore Universal Telephone Service Act.

   1.3   Participation in California LifeLine by Non-Traditional Providers (wireless, VoIP, etc.) is optional.  However, any Non-Traditional Provider that offers LifeLine (either California LifeLine or federal-only Lifeline) in California must comply with the rules established in this General Order.

2. DEFINITIONS

   2.1   "Anniversary Date" –The Anniversary Date falls on the one-year anniversary of the LifeLine subscriber's Application Date and annually thereafter.

   2.2   "Annual LifeLine Notice" – The written notice that each California LifeLine Service Provider annually sends to all of its residential customers regarding the availability, terms, and conditions of California LifeLine.

   2.3   "Applicant" – A new or existing voice service customer who has requested California LifeLine and is undergoing the Application Process.

   2.4   "Application Date" – The date a new or existing customer calls his/her California LifeLine Service Provider and requests LifeLine service.  The "Application Date" serves as the starting point for LifeLine discount back-credits once the California LifeLine Administrator determines eligibility and notifies the applicant's California LifeLine Service Provider.

   2.5   "Application Form" – The document sent by the California LifeLine Administrator to applicants that they must fill out (either on paper or online) and return to the California LifeLine Administrator to be considered for California LifeLine eligibility.

   2.6   "Application Process" – A process that an applicant must undergo when applying to enroll in California LifeLine.

   2.7   "Basic Residential Telephone Service", "Basic Service", or "Service" – A class of local telephone service, whose use is for domestic rather than business purposes, furnished to a

customer at the customer's residence.

2.8   "Business Day" – Official business day of the State of California.

2.9   "California High Cost Fund B (CHCF-B)" – A fund established by the Commission in D. 96-10-066 for the purpose of subsidizing residential telephone service provided by Carriers of Last Resort (COLRs) in designated high-cost areas of the State.

2.10  "California LifeLine Administrator" – A third-party administrator designated by the Commission to qualify applicants and verify the continued eligibility of subscribers.

2.11  "California LifeLine Program" – A California public purpose program, which is sometimes referred to as "California LifeLine" or "LifeLine." California LifeLine is a class of local discounted Basic Residential Telephone Service designed to meet the minimum communication needs of low-income residential customers. California LifeLine includes all of the service elements set forth in Appendix A of this General Order. California LifeLine is funded by a surcharge on all end users of intrastate telecommunications services for discounted services to eligible customers and reimburses California LifeLine Service Providers that participate in the program, as set forth in this General Order.

2.12  "California LifeLine Service Provider" – A telecommunications carrier (or Non-Traditional Provider such as a wireless provider) that offers Basic Residential Telephone Service and that offers California LifeLine service as defined by this General Order.

2.13  "Carrier" – Any provider of end-user intrastate telecommunications services such as local exchange carriers, competitive local carriers, interexchange carriers, commercial mobile radio service carriers, and paging companies.

2.14  "Carrier of Last Resort (COLR)" – A carrier that is required by D. 96-10-066 to provide telephone service, upon request, to all residential and business customers within a designated geographic area. A COLR may be designated as such pursuant to D. 96-10-066, Appendix B, Rule 6.D.1, or voluntarily acquire such status pursuant to D. 96-10-066, Appendix B, Rule 6.D.4.

2.15  "Commission" – The California Public Utilities Commission.

2.16  "Communications Division (CD)" – An division within the Commission that is responsible for carrying out those duties and responsibilities related to California LifeLine that is set forth in this General Order.

2.17  "Customer" – An individual that is responsible for ordering, paying for, and making decisions regarding services purchased from a carrier or other service provider in California.

2. 18  "Deadline Date" – The date printed on the customer's Application or Renewal Form, by which the form and any supporting information must be received by the California LifeLine Administrator to avoid having the form rejected.

2.19  "Deaf and Disabled Telecommunications Program (DDTP)" – A public purpose program established pursuant to California Public Utilities Code §2881 et seq., to provide persons who are deaf, hard of hearing, or disabled with free telecommunications equipment and services for the purpose of enabling such customers to communicate over the public telephone network.

2.20  "Decision Date" – The date upon which the California LifeLine Administrator notifies California LifeLine Service Providers of its decision regarding an applicant's eligibility. For

applicants, the Decision Date will be 1 day after the eligibility determination. For Renewal subscribers, the Decision Date will be 1 day before the subscriber's Anniversary Date.

2.21   "Denial Date" – During the Application and Renewal Processes, the date upon which the California LifeLine Administrator determines applicants or subscribers to be ineligible.

2.22   "Deposit" – Money charged to a customer as security to the serving carrier in order to establish or re-establish service as required by the carrier's applicable terms of service.

2.23   "Disabled Person" – A person who is qualified to obtain free telecommunications equipment and services through the DDTP pursuant to California Public Utilities Code §2881 et seq.

2.24   "Eligible Telecommunications Carrier (ETC)" – A common carrier designated by a state commission pursuant to Subpart C of Title 47 of the Code of Federal Regulation (47 C.F.R.) §54.201. An ETC is required to provide to qualified low-income customers, the services described in Subpart E of 47 C.F.R. §54.201, and to comply with additional conditions imposed by the Commission as part of the ETC approval process. The ETC is eligible to receive the federal financial support for the provision of such services.

2.25   "End-User Common Line (EUCL) Charge" – The Federal Communications Commission (FCC) mandated monthly charge assessed directly on end-users of telecommunications services to recover portion of a carrier's interstate-allocated cost of the access line, as defined by the FCC, between the carrier's central office and the end-user's premises. Also known as the Subscriber Line Charge (SLC).

2.26   Extended Area Service (EAS)" – An exchange service available to customers in a particular exchange or district area for communication throughout that exchange and other designated areas in accordance with the provisions of a carrier's exchange tariffs.

2.27   "Flat-Rate Service" – Local telephone service satisfying the requirements of Basic Residential Telephone Service for unlimited local calls without additional charges at a fixed monthly rate.

2.28   "Gross Revenues" – All revenues billed by a telecommunications carrier to end users for the provision of Intrastate Telecommunications Services, excluding all federal, state, and local taxes and all accounts that have been found to be worthless and written off for income tax purposes or, if the telecommunications carrier is not required to file income tax returns, written off in accordance with generally accepted accounting principles.

2.29   "Household" – Any individual or group of individuals who are living together as one economic unit in the same residence.

2.30   "Income-Based Criterion" – A means of determining eligibility for California LifeLine based on the number of members in the applicant's household and corresponding income limit established by the Commission for enrolling in California LifeLine.

2.31   "Incremental Costs" – Incremental Costs are defined as those costs that (i) are directly attributable to the California LifeLine program, (ii) would not be incurred in the absence of the California LifeLine program, and (iii) are not recovered elsewhere by the California LifeLine Service Provider.

2.32   "Incumbent Local Exchange Carrier (ILEC)" – The definition of ILEC is set forth in Section 251(h) of the Telecommunications Act of 1996. ILECs are each required to serve as a COLR, pursuant to D. 96-10-066, Appendix B, Rule 6.D.1.

2.33 "Intrastate Telecommunication Service" – Any telecommunications service that originates and terminates within the boundaries of the State of California.

2.34 "LifeLine Line" – A single subsidized telephone connection provided by a California LifeLine Service Provider under the California LifeLine Program to a qualifying household.

2.35 "Measured-Rate Service" – Local telephone service satisfying the requirements of Basic Residential Telephone Service for which there is a usage-based charge for some or all local calls.

2.36 "Medical Certificate" – A certificate signed by a medical professional which states that a designated telephone customer has a disability that qualifies the customer for specialized telecommunications equipment from the DDTP.  Medical certificates must comply with California Public Utilities Code §2881 et seq.

2.37 "Non-Traditional Providers" – California LifeLine Service Providers that do not hold Certificates of Public Convenience and Necessity (CPCN) from the Commission, including but not limited to wireless and Voice over Internet Protocol (VoIP) services, and voluntarily elect to offer California LifeLine as set forth in this General Order.

2.38 "Pre-Qualification" – The process by which California LifeLine applicants apply for California LifeLine, but do not receive the California LifeLine discount until their applications have been received and approved by the California LifeLine Administrator.

2.39 "Program-Based Criterion" – An eligibility based on participation in various means-tested programs approved by the Commission.

2.40 "Public Advisor" – An organizational unit within the Commission that is responsible for carrying out those duties and responsibilities related to California LifeLine as set forth in this General Order.

2.41 "Regular Rates" – A carrier's or Non-Traditional Provider's undiscounted rates and charges for telephone services that are applicable to non-California LifeLine residential customers.

2.42 "Renewal Form" – A form sent by the California LifeLine Administrator to existing LifeLine subscribers as part of the Renewal Process that must be completed (either in writing or online) and returned to the California Lifeline Administrator in order to continue receiving their California LifeLine discounts.

2.43 "Renewal Form (Documentation Required)" – A form sent by the California LifeLine Administrator to existing California LifeLine subscribers as part of the Renewal Process that must be completed in writing (with proof of eligibility) and returned to the California Lifeline Administrator in order  to continue receiving their California LifeLine discounts.

2.44 "Renewal Process" – A process that subscribers must undergo annually before their Anniversary Date to continue their enrollment in California LifeLine.

2.45 "Residence" – That portion of an individual house, building, flat, or apartment (a dwelling unit) occupied entirely by a single household as that term is defined by these rules.  A room or portion of a dwelling unit occupied exclusively by a household not sharing equally as a member of the domestic establishment may be considered a separate residence for the application of California LifeLine.

2.46 "Service Connection Charge" – A non-recurring charge, for the installation of Basic

Residential Telephone Service or the non-regulated residential service provided by a Non-Traditional Provider, that is paid by the customer applying for such service.

2.47 "Service Conversion Charge" – A non-recurring charge,  that may be applicable when a customer changes the class, type, or grade of service, such as  changing from Measured Rate Service to Flat Rate Service.

2.48 "Service Start Date" – The date a new customer begins receiving phone service, and is billed for such service.  Once the California LifeLine Administrator approves the Application Form, the subscriber receives California LifeLine discounts back to the Application Date.

2.49 "Specific Support Amount" (SSA) – A maximum support amount reimbursed to California LifeLine Service Providers for the monthly recurring charge of California LifeLine service to subscribers.  The SSA may be adjusted annually by the Commission.

2.50 "Subscriber" – A person who is qualified for and receiving California LifeLine service, set forth in this General Order, at his or her principal place of residence.

2.51 "Surcharge" – The percentage increment, as determined by the Commission, which is applied to the end-user's Intrastate Telecommunications Services.

2.52 "Text-Telephone Device" – A device used by disabled persons to send and receive information over a telephone line in text and graphic forms.  A text-telephone device is commonly referred to as a "TTY."

2.53 "Three-Month Commercial Paper Rate" – The Three-Month Commercial Paper Rate published in the Federal Reserve Statistical Release, G-13.

2.54 "Toll Blocking" – A service whereby the subscriber elects to prevent the completion of outgoing toll calls.

2.55 "Toll Control" – A service whereby the subscriber specifies a certain level of toll usage that may be incurred per month or per billing cycle.

2.56 "Toll Limitation Service" – A service that includes, but is not limited to, Toll Blocking or Toll Control.

2.57 "Total Household Income" – All revenues, from all members of a household, from whatever source derived, whether taxable or non-taxable, including, but not limited to: wages, salaries, interest, dividends, spousal support and child support, grants, gifts, allowances, stipends, public assistance payments, social security and pensions, rental income, income from self-employment and cash payments from other sources, and all employment-related, non-cash income.

2.58 "Universal LifeLine Telephone Service (ULTS) Trust Administrative Committee (ULTS-AC)" – An advisory board that advises the Commission on the development, implementation, and administration of California LifeLine to ensure it is available to the people of the state, as provided by this General Order and the Moore Universal Telephone Service Act.

2.59 "Universal LifeLine Telephone Service (ULTS) Trust Administrative Committee Fund (LifeLine Fund)" – A repository of California LifeLine surcharge monies used to reimburse California LifeLine Service Providers and others as directed by the Commission for the costs associated with the provision and administration of the California LifeLine Program.

3.  TARIFF FILINGS

    3.1   Carriers that are required to file tariffs with the Commission shall include in their tariffs the requirement to collect the California LifeLine surcharge from their customers.

    3.2   Carriers that are required to file tariffs for Basic Residential Telephone Service with the Commission shall include in their tariffs the requirement to offer California LifeLine to the public under terms and conditions that reflect the requirements of California Public Utilities Code §871 et seq., relevant Commission decisions, and this General Order.

    3.3   All tariff filings pertaining to any aspect of California LifeLine and/or the California LifeLine surcharge shall be filed in accordance with California Public Utilities Code §489 and General Order 96-B.  No tariff or Schedule of Rates and Charges shall substantially depart from the intent of this General Order.

    3.4   Non-Traditional Providers not required to file tariffs shall file a schedule of California LifeLine rates and charges, updated annually, that reflect the requirements set forth in this General Order.

    3.5   Non-Traditional Providers that voluntarily offer LifeLine service in California shall file with the Commission a schedule of LifeLine rates and charges, updated annually, that reflect the requirements set forth in this General Order.

4.  NOTICES, ENROLLMENT, AND FORMS

    4.1   Initial California LifeLine Notice.

        4.1.1   California LifeLine Service Providers shall inform new residential customers calling to establish Basic Service or non-regulated residential service, as applicable, about the availability of California LifeLine, a discount program for customers with a household member currently enrolled in certain public assistance programs or customers with qualifying household income.  If customers indicate that they are interested in applying for California LifeLine, California LifeLine Service Providers shall contact the California LifeLine Administrator to begin the California LifeLine Application Process for the customer in accordance with Section 4.2 of this General Order and the Timeline for Processing California LifeLine Qualifications (found at http://www.cpuc.ca.gov/PUC/Telco/Information+for+providing+service/FormNotices_Public+Program.htm )..

        4.1.2   California LifeLine Service Providers shall not link the availability of discounted phone service under California LifeLine with the sale of non-California LifeLine services.

        4.1.3   In accordance with the Timeline for Processing California LifeLine Qualifications (found at http://www.cpuc.ca.gov/PUC/Telco/Information+for+providing+service/FormNotices_Public+Program.htm ), California LifeLine Service Providers shall send a confirmation notice to all California LifeLine applicants informing them of the arrival of Application Forms from the California LifeLine Administrator and the requirement to return the completed forms with all required documentation.  The notice shall also inform California LifeLine applicants that failure to return the forms and eligibility documentation by the Deadline Date will result in the denial of the application for discounted California LifeLine telephone service.

GO 153 (Effective December 1, 2011 – D. 10-11-033, Resolution T-17321)

4.2    Enrollment

4.2.1    California LifeLine Service Providers shall ask the customer whether he/she is currently or within the last 30 days has been enrolled in California LifeLine by another California LifeLine Service Provider.

4.2.1.1    If yes, the California LifeLine Service Provider shall then contact the California LifeLine Administrator to validate the customer's approved status. The California LifeLine Service Provider shall inform the customer that the California LifeLine Administrator will notify the customer and the customer's current California LifeLine Service Provider once it determines whether or not the customer is currently or within the last 30 days has been enrolled in California LifeLine.  If the California LifeLine Administrator cannot confirm the customer's continued eligibility, the customer will be treated as a new California LifeLine applicant and be subject to the Application Process.

4.2.1.2    If no, ask the customer if any member of his/her household is enrolled in a public assistance program.

4.2.1.2.1 If yes, read the means-tested programs listed in Section 5.1.5 of this General Order and ask the customer whether any household member is enrolled in any of these programs.  California LifeLine Service Providers may use the step-down approach when reading the means-tested programs and stop when the customer confirms that a household member is enrolled in an approved program.

4.2.1.2.1.1    If the customer verbally indicates participation in an approved public program, immediately contact the California LifeLine Administrator to begin the Application Process and inform the customer that: (i) the customer will receive an Application Form in the mail; (ii) the Application Form must be completed and signed by the person whose name appears on the form and returned to the California LifeLine Administrator before the due date indicated on the form; and (iii) specify any deposits required; (iv) a payment plan is available for nonrecurring charges and deposits relating to basic service, and (v) the California LifeLine Administrator will notify the customer and the customer's California LifeLine Service Provider once it determines whether or not the customer is eligible for California LifeLine.

4.2.1.2.2 If no, ask the customer about his/her household size and read the corresponding California LifeLine income limit information outlined in Section 5.1.4 of this General Order that the applicant must meet in order to qualify for California LifeLine.

4.2.1.2.2.1    If the customer verbally indicates that he/she is eligible under the income guidelines, immediately

contact the California LifeLine Administrator to begin the California LifeLine Application Process for the customer.  The California LifeLine Service Provider shall also inform the customer that he/she must also provide income document(s) substantiating the household income, and inform the customer that: (i) the customer will be receiving an Application Form in the mail; (ii) the Application Form must be completed and signed by the person whose name appears on the form, and returned to the California LifeLine Administrator before the due date indicated on the form; (iii) a copy of the supporting income document(s) that reflect total household income must be included with the Application Form; (iv) a payment plan is available for nonrecurring charges and deposits relating to basic service; and (v) the California LifeLine Administrator will notify the customer and the customer's California LifeLine Service Provider once it determines whether or not the customer is eligible for California LifeLine.

4.2.2   California LifeLine Service Providers must inform the applicant that he or she may opt to receive the instructions for the Application Form in Braille (English Only) or instructions and Application Form in large print.

4.2.3   California LifeLine Service Providers shall also inform the customer of the availability of two California LifeLine lines if a member of the household uses a TTY when making a call,

    4.2.3.1   If the customer verbally certifies that he/she qualifies for two California LifeLine lines, the California LifeLine Service Provider shall immediately contact the California LifeLine Administrator to begin the California LifeLine Application Process for the second California LifeLine line and remind the customer that he/she must provide proof for the need of a TTY as outlined in Section 5.1.8 of this General Order.

4.2.4   California LifeLine Service Providers shall inform California LifeLine applicants that they will incur Basic Service rates and charges until approval of their California LifeLine Application Form.  California LifeLine Service Providers shall offer California LifeLine applicants a payment plan for the non-recurring charges and deposits for Basic Service, and shall inform applicants of the existence of such plans.

4.2.5   California LifeLine Service Providers shall inform California LifeLine applicants that once approved, they will receive a credit on their bill for California LifeLine discounts retroactive to their Application Date.  If they have a net credit balance of at least $10.00 on their next bill, they may request a refund check for any such net credit balance from their respective California LifeLine Service Provider.

4.3   Annual California LifeLine Notice.

GO 153 (Effective December 1, 2011 – D. 10-11-033, Resolution T-17321)

4.3.1   Every California LifeLine Service Provider offering California LifeLine shall annually send to all of its residential customers, other than customers of foreign exchange, or farmer lines, a notice that contains information about the availability, terms, and conditions of California LifeLine.

    4.3.1.1   The annual notice shall include information about the availability, terms, and conditions of two California LifeLine lines for qualified disabled persons.

    4.3.1.2   Every California LifeLine Service Provider shall submit its annual notice to the Commission Public Advisor (PA) for the PA's review and approval.  Once approved, a California LifeLine Service Provider does not need to resubmit its annual notice to the PA unless there is a material change to the notice.  A change to the annual notice to reflect the annual adjustment to California LifeLine income eligibility limits is not a material change to the notice.

4.4   Customer Application Form.

4.4.1   An Application Form must be completed when customers apply to enroll in California LifeLine.

    4.4.1.1   A copy of the Application Form and associated instructions can be found at www.californialifeline.com.

        4.4.1.1.1   The instructions must inform California LifeLine applicants that the Commission or the California LifeLine Administrator may audit the subscriber's eligibility to participate in California LifeLine.  The instructions shall also state that if the audit established that the subscriber is ineligible, the subscriber will be removed from California LifeLine and billed for previous California LifeLine discounts that the subscriber should not have received plus interest at the Three-Month Commercial Paper Rate.

        4.4.1.1.2   The instructions must inform California LifeLine applicants that submitted income and/or supporting documentation will not be returned.

    4.4.1.2   The Application Form will be partially completed by the California LifeLine Administrator based on information provided by California LifeLine Service Providers.

4.5   Subscriber Renewal Form.

4.5.1   Subscribers must complete a Renewal Form annually prior to their Anniversary Date to verify continued eligibility in California LifeLine.

    4.5.1.1   A copy of the Renewal Form and associated instructions can be found at www.californialifeline.com.

        4.5.1.1.1   The instructions must inform California LifeLine subscribers that the Commission or the California LifeLine Administrator may audit the subscriber's eligibility to participate in California LifeLine.  The instructions shall also state that if the audit established that the subscriber is ineligible, the subscriber will be

removed from California LifeLine and billed for previous California LifeLine discounts that the subscriber should not have received plus interest at the Three-Month Commercial Paper Rate.

4.5.1.1.2   The instructions must inform LifeLine subscribers that submitted income and/or supporting documentation will not be returned.

4.5.1.2   The Renewal Forms will be partially completed by the California LifeLine Administrator based on information provided by California LifeLine Service Providers.

4.6   California LifeLine Notices, Forms and Instructions in the Language of Sale.

4.6.1   The languages currently supported by the California LifeLine program are found in Section 6.1.1.2.

4.6.2   With the exception of those sales where the applicant, subscriber or California LifeLine Service Provider requested the use of an outside translation service, any California LifeLine Service Provider that sells California LifeLine in a language other than English shall provide those subscribers to whom it sold California LifeLine in a language other than English with the following:

4.6.2.1   Commission-managed California LifeLine notices in the language in which the California LifeLine Service Provider originally sold California LifeLine to the subscriber.

4.6.2.2   Toll-free access to customer service representative who are fluent in the language in which the California LifeLine Service Provider originally sold California LifeLine to the subscriber.

4.6.2.3   California LifeLine Service forms and instructions in the language in which the California LifeLine Service Provider originally sold California LifeLine to the applicant and/or subscriber.

4.7   California LifeLine Service Providers making changes to their California LifeLine service offering and must give 30 days notice to their California LifeLine subscribers for any of the following reasons:

4.7.1   Increases to the California LifeLine rate pursuant to Section 8 and Public Utilities Code §874(a)

4.7.2   Service restrictions to its California LifeLine service

4.7.3   Withdrawal of California LifeLine service participation (Non-Traditional Providers only).  Traditional carriers must comply with General Order 96-B industry noticing requirements.

## 5.   ELIGIBILITY CRITERIA FOR OBTAINING AND RETAINING CALIFORNIA LIFELINE

5.1   California LifeLine is available to any residential customer who meets all of the following eligibility requirements:

5.1.1   The residence at which the service is requested is the subscriber's principal place of

residence.  An applicant for California LifeLine service may report only one address in this state as his/her principal place of Residence.

5.1.2    The subscriber and members of the subscriber's household collectively have one discounted service from either the California LifeLine program or the federal Lifeline low income program (Non-Traditional Providers only), except as provided for in Section 4 of this General Order.

5.1.3    The customer's eligibility meets either the Income-Based Criterion or the Program-Based Criterion.

5.1.4    Income-Based Criterion allows an applicant to enroll in California LifeLine based on his/her Total Household Income, i.e. members of the applicant's household collectively earn no more than the mandated annual income limits[1].

5.1.4.1    The income used to determine eligibility for California LifeLine shall be based on the definition of "Total Household Income" as defined in Section 2.58, above.

5.1.4.2    For households with self-employed members, the "income from self-employment" shown on IRS Form 1040, Schedule C, line 29, shall be used to assist in the determination of whether a California LifeLine applicant is eligible to participate in California LifeLine.

5.1.4.3    Borrowed money shall not be considered as income when determining eligibility for California LifeLine.

5.1.4.4    Funds transferred from one account to another, such as from savings account to a checking account, shall not be considered as income when determining eligibility for California LifeLine, even if such funds are used for living expenses.

5.1.4.5    The customer must provide income documentation substantiating his/her Total Household Income.  Acceptable income documents are:

5.1.4.5.1    Prior year's state, federal, or tribal tax return

5.1.4.5.2    Current income statement from an employer or paycheck stub for three consecutive month's worth of the same type of statements within the last 12 months.

5.1.4.5.3    Statement of benefits from Social Security, Veterans Administration

5.1.4.5.4    Statement of benefits from retirement/pension, Unemployment/ Workmen's Compensation

5.1.4.5.5    A divorce decree

5.1.4.5.6    Child support document

5.1.4.5.7    Other official documents

---

[1] Income limits are updated and published annually on the Commission website at (http://www.cpuc.ca.gov/PUC/Telco/Public+Programs/LifeLinedetails.htm#qualify), and notices sent to all carriers and Non-Traditional Carriers, per Section 5.2.1, below.

GO 153 (Effective December 1, 2011 – D. 10-11-033, Resolution T-17321)

5.1.5    Program-Based Criterion allows a applicant to enroll in California LifeLine based on participation by the applicant or a member of the applicant's household in a means-tested programs approved by the Commission.  Approved means-test programs are:

    5.1.5.1    Medicaid or Medi-Cal

    5.1.5.2    CalFresh Program, formerly known as "Food Stamps"

    5.1.5.3    Supplemental Security Income

    5.1.5.4    Federal Public Housing Assistance or Section 8

    5.1.5.5    Low Income Home Energy Assistance Program (LIHEAP)

    5.1.5.6    Temporary Assistance for Needy Families (TANF), known in California under the following names:

        California Work Opportunity and Responsibility to Kids (CalWORKs)

        Stanislaus County Work Opportunity and Responsibility to Kids (StanWORKs)

        Welfare-To-Work (WTW)

        Greater Avenues for Independence (GAIN)

    5.1.5.7    National School Lunch Program (NSLP)

    5.1.5.8    Tribal TANF

    5.1.5.9    Bureau of Indian Affairs General Assistance

    5.1.5.10  Head Start Income Eligible (Tribal Only)

    5.1.5.11  Healthy Families Category A

    5.1.5.12  Women, Infants and Children Program (WIC)

5.1.6    No customer who is claimed as a dependent on another person's income tax return shall be eligible for California LifeLine.

5.1.7    No member of a subscriber's family, residence or household who resides with the subscriber is eligible for California LifeLine, except as provided for in Sections 5.1.8 to 5.1.10 below.

5.1.8    A subscriber shall be eligible to receive two California LifeLine lines if: (i) the subscriber meets all California LifeLine eligibility criteria set forth above; (ii) a member of the subscriber's household is disabled and has immediate and continuous access within the household to a TTY; and (iii) the TTY is issued by DDTP or a medical certificate indicating the household member's need for a TTY is submitted.

5.1.9    All California LifeLine rules and regulations that apply to the one California LifeLine line shall apply equally to the second California LifeLine line provided to a subscriber.

5.1.10   An applicant whose California LifeLine application is rejected for not being a member of a means-tested program listed in Section 5.1.5, who can demonstrate membership by a member of the subscriber's household in a county-equivalent means-test program can appeal the decision of the California LifeLine Administrator with the Commission

Consumer Affairs Branch (CAB).

5.2    The California LifeLine income limits will be adjusted each year for inflation based on the Federal Consumer Price Index - Urban Areas.

    5.2.1    CD shall adjust California LifeLine income limits by April 15th of each year.  CD shall notify California LifeLine Service Providers of the annual adjustment within five business days of the adjustment being made.  All California LifeLine Service Providers shall implement the adjusted California LifeLine income limits by no later than June 1st of each year.

        5.2.1.1    To implement the annual adjustment to California LifeLine income limits, California LifeLine Service Providers shall follow the following procedure:

            5.2.1.1.1    (i) file revised tariffs or LifeLine Schedule of Rates and Charges, whichever is applicable, that reflect (a) the adjusted income limits, and (b) the instructions, if any, contained in the notice of the annual adjustment sent by CD; and (ii) revise their annual LifeLine notice to reflect the adjusted LifeLine income limits.

5.3    No California LifeLine Service Provider shall knowingly enroll into California LifeLine an applicant who does not meet the California LifeLine eligibility criteria.  No California LifeLine Service Provider shall knowingly allow a subscriber to remain in California LifeLine who does not meet the California LifeLine eligibility criteria.

5.4    Each applicant enrolling in California LifeLine is subject to the Application Process described below:

    5.4.1    Upon receiving the Application Form, the customer has the option of enrolling in California LifeLine under either: (i) the Program-Based Criterion, or (ii) the Income-Based Criterion.

        5.4.1.1    If the applicant has a household member currently enrolled in any of the means-tested programs listed in Section 5.1.5 of this General Order, the customer should enroll under the Program-Based Criterion and complete the section of the Application Form entitled "Method 1 Program-Based."

        5.4.1.2    If the customer does not have a household member currently enrolled in any of the means-tested programs listed in Section 5.1.5 of this General Order, the customer *must* enroll under the Income-Based Criterion listed in Section 5.1.4 of this General Order, and complete the section of the Application Form entitled "Method 2 Income-Based".

    5.4.2    The Application Form shall be signed by the applicant whose name appears on the California LifeLine Service Provider's account, the customer's legal guardian or a person operating pursuant to a power of attorney for such customer.

        5.4.2.1    By signing the form, the customer is certifying, under penalty of perjury, that the information contained in the completed form and submitted documents, if any, are true and correct.

    5.4.3    The completed Application Form and supporting documents, if any, must be received by the California LifeLine Administrator on or before the deadline date specified in the

Application Form.

5.4.4   Any applicant who fails to return the Application Form or otherwise fails to qualify for California LifeLine as specified on the Application Form by the deadline date shall have their application rejected.

5.4.5   A subscriber changing his/her California LifeLine Service Provider shall not be required to undergo the Application Process, provided that the subscriber initiates California LifeLine service with his/her new California LifeLine Service Provider within 30 days of disconnecting California LifeLine service with the previous California LifeLine Provider and the subscriber maintains eligibility in all other respects.  If a subscriber changes his or her principal place of residence, while maintaining eligibility in all other respects, the subscriber shall not be required to go through the Application Process again.

5.4.6   Upon successful completion of the Application Process, the subscriber's Basic Service will be converted to California LifeLine service and the subscriber's account will be credited the difference between California LifeLine rates and charges and regular rates and charges, as outlined in Section 8.1 of this General Order, and any deposits related to basic service, as of the California LifeLine subscriber's Application Date. Subscribers with a net credit balance of at least $10.00 reflected on their next bill may request a refund check in the amount of such net credit balance from their California LifeLine Service Provider.

5.5   To remain in California LifeLine, each California LifeLine subscriber is subject to the annual Renewal Process described below:

5.5.1   Upon receiving the Renewal Form, the subscriber has the option of qualifying his/her continued eligibility under either: (i) the Program-Based Criterion, or (ii) the Income-Based Criterion.

5.5.1.1   If the subscriber has a household member currently enrolled in any of the means-tested programs listed in Section 5.1.5 of this General Order, the subscriber should continue his/her California LifeLine enrollment under the Program-Based Criterion and complete the section of the Renewal Form entitled "Method 1 Program-Based."

5.5.1.2   If the subscriber does not have a household member currently enrolled in any of the means-tested programs listed in Section 5.1.5 of this General Order, the subscriber *must* continue his/her California LifeLine enrollment under the Income-Based Criterion listed in Section 5.1.4 of this General Order, and complete the section of the Renewal Form entitled "Method 2 Income-Based".

5.5.2   The Renewal Form shall be signed by the subscriber whose name appears on the California LifeLine Service Provider's account, the subscriber's legal guardian or a person operating pursuant to a power of attorney for the subscriber.

5.5.2.1   By signing the form, the subscriber is certifying, under penalty of perjury, that the information contained in the completed form and all submitted documents, if any, are true and correct.

5.5.3    The completed Renewal Form must be received by the California LifeLine Administrator on or before the due date specified on the Renewal Form.

    5.5.3.1    If the subscriber receives a "Renewal Form (Documentation Required)," the completed form with all supporting documents must be received by the California LifeLine Administrator on or before the due date specified on the Renewal Form.

5.5.4    Any subscriber who fails to qualify for continued eligibility in California LifeLine shall be removed from the California LifeLine Program.  Upon notification from the California LifeLine Administrator, the California LifeLine Service Provider shall convert the subscriber to Basic Residential Service starting with the Denial Date provided by the California LifeLine Administrator.  No Service Conversion Charges shall be billed to the customer for this change in service.

5.5.5    Applicants who wish to re-establish California LifeLine service after removal from California LifeLine will be treated as a new applicant, subject to the Application Process pursuant to Section 4.2 and a Service Conversion Charge (once the applicant has successfully re-established California LifeLine service).  The California LifeLine discount will be effective on the Application Date, and not be applied retroactively to the prior enrollment period.

5.6    California LifeLine subscribers must notify their California LifeLine Service Provider of any change that causes the California LifeLine subscriber to no longer qualify for (i) California LifeLine, or (ii) a second California LifeLine line.  Upon receipt of notification, the California LifeLine Service Provider will change the subscriber's California LifeLine service to Basic Residential Telephone Service.  No Service Conversion Charges shall be billed to the customer for this change in service.

5.6.1    The California LifeLine Service Provider may require a deposit, if applicable.

5.7    The Commission and/or the California LifeLine Administrator may audit and verify a subscriber's eligibility to participate in the California LifeLine Program.

5.7.1    Any California LifeLine subscriber who is found to be ineligible to participate in the California LifeLine Program shall be removed from California LifeLine.

    5.7.1.1    Upon notification from the Commission or the California LifeLine Administrator, the California LifeLine Service Provider shall change the ineligible subscriber's California LifeLine account to Basic Service and apply regular rates.  Such notification shall specify the effective date of the change, (based on the Denial Date). No Service Conversion Charges shall be billed to the subscriber for this change in service.

        5.7.1.1.1 The California LifeLine Service Provider may require a deposit, if applicable.

5.7.2    The California LifeLine Service Provider may bill the ineligible subscriber for any California LifeLine discounts that the subscriber should not have received, plus interest determined in accordance with the Three-Month Commercial Paper Rate.

    5.7.2.1    The Commission will inform the California LifeLine Service Provider that is

also an ETC of the amount recovered from the ineligible subscriber and the applicable portion of this amount that should be returned to the federal Lifeline and/or Link-Up programs and the California LifeLine Fund.

    5.7.2.2    The California LifeLine Service Provider will include in the California LifeLine claim the amount remitted to the federal Lifeline and/or Link-Up programs as directed by the Commission.

5.8    Customers may dispute the California LifeLine Administrator's finding of ineligibility by submitting an Informal Appeal to the Commission's Consumer Affairs Branch (CAB) in writing to "CPUC Informal Complaints", 505 Van Ness Ave., San Francisco, CA 94102; or on the internet/web at http://www.cpuc.ca.gov/PUC/aboutus/Divisions/CSID/Consumer+Affairs/.

    5.8.1    If the California LifeLine Administrator's determination of ineligibility is overturned on appeal, Lifeline discounts shall be applied retroactive to the Application Date for a new subscriber or the Anniversary Date for a renewing subscriber.

5.9    A California Lifeline applicant whose appeal with the Commission's Consumer Affairs Branch is denied and who wishes to pursue the matter further, may file a formal complaint with the Commission.  Information on the Consumer Affairs Branch and how to file a formal complaint shall be displayed at: http://www.cpuc.ca.gov/PUC/aboutus/Divisions/CSID/Consumer+Affairs/.

## 6.  CALIFORNIA LIFELINE ADMINISTRATOR

6.1    The California LifeLine Administrator is a third-party administrator retained under contract by the Commission.

    6.1.1    The role of the California LifeLine Administrator is to qualify new applicants and to verify the continued eligibility of existing California LifeLine subscribers.

        6.1.1.1    The California LifeLine Administrator must furnish all California LifeLine Forms (Application, Renewal, Renewal (Documentation Required)), instructions and letters to customers in their language of sale (if supported by the program), as that language preference is provided to the California LifeLine Administrator by the California LifeLine Service Providers.

        6.1.1.2    The California LifeLine Program currently supports English, Spanish, Chinese (Mandarin and Cantonese), Korean, Vietnamese, Tagalog, Japanese, and English Braille.  All supported languages (except for Braille) are available in Large Print.

    6.1.2    The schedule that the California LifeLine Administrator must adhere to in evaluating an applicant's or existing subscriber's qualification can be found at http://www.cpuc.ca.gov/PUC/Telco/Information+for+providing+service/FormNotices_Public+Program.htm

6.2    All California LifeLine Service Providers must notify the California LifeLine Administrator before their initial offering of California LifeLine and arrange the two-way exchange of its California LifeLine subscriber data.

6.3    California LifeLine Service Providers shall provide California LifeLine subscriber data to the California LifeLine Administrator notwithstanding any tariff, contractual, or legal restrictions on limiting the disclosure of non-published customer information.

    6.3.1    All California LifeLine Service Providers must provide the California LifeLine Administrator with their California LifeLine subscriber/applicant activities by the end of the next business day after the service order completion.

    6.3.2    All California LifeLine Service Providers must provide the California LifeLine Administrator with all California LifeLine subscriber/applicant activities initiated by the California LifeLine Service Providers by the end of the next business day after the service order completion date.

    6.3.3    The California LifeLine Administrator shall provide each California LifeLine Service Provider the following information on California LifeLine subscribers by the end of the next business day from the time of completion of the applicant's or subscriber's qualification review:

        6.3.3.1    Newly enrolled subscribers who are found eligible to participate in California LifeLine during the Application Process.

        6.3.3.2    Applicants who are found ineligible to participate in California LifeLine during the Application Process.

        6.3.3.3    Existing LifeLine subscribers who are found eligible to remain in California LifeLine.

        6.3.3.4    Existing California LifeLine subscribers who are found ineligible to remain in California LifeLine.

        6.3.3.5    A daily weighted average California LifeLine subscriber count on a monthly basis.

6.4    On the Decision Date, the California LifeLine Administrator shall notify California LifeLine applicants and subscribers in writing of the final decision of their California LifeLine eligibility, including the right to appeal the California LifeLine Administrator's findings.

## 7.  SERVICE ELEMENTS, SERVICE DEPOSITS & SERVICE REQUIREMENTS OF CALIFORNIA LIFELINE

7.1    All California LifeLine Service Providers offering California LifeLine service shall offer their subscribers all of the service elements set forth in Appendix A of this General Order.

7.2    California LifeLine is restricted to residential customers who meet the criteria set forth in Section 5.1, above.

7.3    LifeLine is restricted to residential service.  Foreign exchange, farmer lines, and other non-LifeLine services are excluded from this offering.

7.4    California LifeLine Service Providers may require customers to post a deposit upon service initiation.  However, upon notification of California LifeLine eligibility from the California LifeLine Administrator, California LifeLine Service Providers must credit the deposit for Basic Service on the subscriber's bill statement (if applicable).  California LifeLine Service

GO 153 (Effective December 1, 2011 – D. 10-11-033, Resolution T-17321)

Providers may require a deposit for other services ordered by the California LifeLine subscriber.

7.5 California LifeLine Service Providers may require a California LifeLine subscriber to pay any overdue California LifeLine rates and charges incurred by that subscriber, or make payment arrangements, before California LifeLine is reinstated at the same or new address.

7.6 Other than previously stated, California LifeLine is subject to the conditions of "Discontinuance and Restoration of Service" as set forth in the California LifeLine Service Provider's tariffs or Schedule of Rates and Charges related to service termination and reconnection.

7.7 If a subscriber is disconnected for nonpayment of toll charges, a California LifeLine Service Provider must provide California LifeLine to the subscriber if the subscriber elects to receive Toll Blocking.


8. CALIFORNIA LIFELINE RATES AND CHARGES

8.1 California LifeLine Service Providers shall offer California LifeLine priced at the following rates and charges:

8.1.1 Discounted nonrecurring Service Connection Charge for the initial installation or activation of a single telephone connection at the LifeLine subscriber's principal place residence.

8.1.1.1 The California LifeLine Service Connection Charge shall equal the lowest of (i) $10.00, or (ii) 50% of the California LifeLine Service Provider's Service Connection Charge.

8.1.1.2 The California LifeLine Service Connection Charge is applicable to each eligible household residing at the same principal place of residence.

8.1.1.3 The California LifeLine Service Connection Charge may be applicable any time a subscriber (i) establishes a new telephone connection (ii) re-establishes California LifeLine at the same principal place of residence at which California LifeLine was previously provided, (iii) establishes California LifeLine at a new principal place of residence, or (iv) switches California LifeLine from one California LifeLine Service Provider to another.

8.1.1.4 California LifeLine Service Providers may not impose a "central office charge" in addition to the California LifeLine Service Connection Charge when installing or activating California LifeLine.

8.1.1.5 Installation of a second and subsequent telephone service connection shall be subject to the California LifeLine Service Provider's Service Connection Charge at regular rates, except that subscribers with a disabled household member may qualify for California LifeLine Service Connection Charges on two residential telephone connections as per this General Order.

8.1.2 Deferred payment of the California LifeLine Service Connection Charge.

8.1.2.1 California LifeLine Service Providers shall offer California LifeLine

subscribers the option of paying the California LifeLine Service Connection Charge in equal monthly installments with no interest for a period not to exceed 12 months.

8.1.2.2   California LifeLine Service Providers may charge a late-payment fee when California LifeLine subscribers fail to timely remit some or all of the California LifeLine Service Connection Charge under a deferred-payment schedule.

8.1.3   Discounted nonrecurring charge for Service Conversion Charge.

8.1.3.1   The California LifeLine Service Conversion Charge (if applicable) shall equal the lowest of (i) $10.00, (ii) 50% of the California LifeLine Service Provider's Service Connection Charge at regular rates for the initial connection of a single residential telephone line or (iii) the California LifeLine Service Provider's Service Conversion Charge.

8.1.3.2   The California LifeLine Service Conversion Charge is applicable each time a California LifeLine subscriber affects a change in the class, type, or grade of service, including requests to change from Foreign Exchange Service.  There is no limit on the number of times a California LifeLine subscriber may pay the California LifeLine Service Conversion Charge when he or she initiates a change in the class, type, or grade of service.

8.1.3.3   No conversion charge may be assessed on an applicant or claimed from the California LifeLine fund if a California LifeLine applicant fails to qualify.  No conversion charge shall be assessed on a subscriber or claimed from the California LifeLine fund if a subscriber is removed from California LifeLine (either voluntarily or involuntarily).

8.1.4   Discounted monthly California LifeLine rate for Flat Rate Service.

8.1.4.1   From the effective date of D. 10-11-033 until December 31, 2012, California LifeLine subscribers of LifeLine Flat-Rate Service pay no more than $6.84 per month, and no less than a price floor of $5.00, except in EAS exchanges wherein subscribers will pay no more than their California LifeLine rate as of November 19, 2010.

8.1.4.2   Beginning January 1, 2013, California LifeLine subscribers will pay no more than ½ their California LifeLine Service Provider's Flat Rate Service.

8.1.4.3   From the effective date of D. 10-11-033 until December 31, 2012, the California LifeLine Flat-Rate Service will have a price floor of $5.00.

8.1.4.4   Subscribers to California LifeLine Flat Rate Service shall receive unlimited local calling.

8.1.5   Discounted monthly California LifeLine Measured Rate Service.

8.1.5.1   From the effective date of D. 10-11-033 until December 31, 2012, California LifeLine subscribers of LifeLine measured rate service will pay no more than $3.66 per month, and no less than a price floor of $2.50, except in EAS exchanges wherein Subscribers will pay no more than their California

LifeLine rate as of November 19, 2010.

8.1.5.2   Beginning January 1, 2013, California LifeLine subscribers will pay no more than ½ their California LifeLine Service Provider's Measured Rate Service rate

8.1.5.3   From the effective date of D. 10-11-033 until December 31, 2012, LifeLine Measured Rate Service will have a price floor of $2.50.

8.1.5.4   Subscribers of California LifeLine Measured-Rate Service shall receive 60 untimed local calls per month.  The California LifeLine Service Provider shall charge $0.08 per call for each local call in excess of 60 calls per month.

8.1.6   Discounted monthly EAS rate.

8.1.6.1   In wireline exchanges with EAS, subscribers shall pay no more than 50% of the applicable EAS increment.  Unlimited incoming calls shall apply.

8.1.7   Subscribes shall not be charged for the federal End User Common Line (EUCL) charge, also known as the Subscriber Line Charge (SLC).

8.1.8   Subscribers shall not be charged for Toll-Limitation Service (including, but not limited to, Toll Blocking or Toll Control).

8.1.9   There shall be no charge or related credits to California LifeLine subscribers' LifeLine service for surcharges including the following: California High Cost Fund A (CHCF-A) surcharge, California High Cost Fund B (CHCF-B) surcharge, California Teleconnect Fund (CTF) surcharge, California Relay Service and Communications Device Fund surcharge (DDTP), the California LifeLine (ULTS) surcharge, the California Advanced Services Fund (CASF) surcharge, and the CPUC User fee.

8.1.9.1   These surcharges will apply to any other intrastate telecommunications services purchased by California LifeLine subscribers, as required by law.

8.1.9.2   California LifeLine Service Providers shall pay to the appropriate taxing authorities the applicable taxes, fees, and surcharges billed to California LifeLine subscribers and claimed against the California LifeLine Fund.

8.2   A California LifeLine Service Provider may require advance payments for California LifeLine service, not to exceed one month's rates and charges.

8.3   Optional service features, network services, and equipment that are not part of California LifeLine rates and charges, will be available to subscribers at the California LifeLine Service Provider's regular rates and charges.

8.3.1   Non-California LifeLine lines and services will be available to subscribers at the applicable regular rates and charges.

8.3.1.1   This General Order shall not apply to the purchase of any additional, non-California LifeLine lines, services, features, options, and network capabilities by California LifeLine subscribers.

8.4   Except as specifically modified by this General Order, all rules, regulations, rates and charges in conjunction with the California LifeLine Service Provider's tariffs or terms and conditions applicable to non-California LifeLine services are also applicable to the service provided under

GO 153 (Effective December 1, 2011 – D. 10-11-033, Resolution T-17321)

California LifeLine.

8.5 Uniform Regulatory Framework COLRs participating in California LifeLine are required to submit a rate sheet of all their basic flat and measured service rates effective July 31st of each year for the purposes of computing the SSA.

 8.5.1 Until December 31, 2011, the SSA is set at $11.50.

 8.5.2 CD will reset the SSA annually , effective January 1 of each year, at 55% of the highest reported URF COLR rate, rounded to the nearest $0.05.

 8.5.2 CD will prepare a Resolution in 2011 to set the SSA rate to be effective January 1, 2012.

 8.5.3 In subsequent years, the SSA will be set and reported to California LifeLine Service Providers via an Administrative Letter using the same computation methodology set forth in Section 8.5.2.

 8.5.4 CD may update the administrative cost factor annually, by no greater than the CPI-U.

8.6 No later than January 1, 2012, California LifeLine Service Providers shall specifically show all Lifeline reductions, or their equivalent, on the California LifeLine subscriber's bill.

 8.6.1 If reductions are not shown as separate line items, California LifeLine Service Providers shall provide a revised sample bill format to the Public Advisor that includes a section showing the discounts being provided to the customer by August 31, 2011.

 8.6.2 California LifeLine Service Providers must, at a minimum, show the regular non-LifeLine rate, Federal support credits, and any California LifeLine support credits on subscriber's bills in a manner discernible by the public, which may include, but is not limited to, a bill message.

 8.6.3 The requirement to show reductions under Section 8.6 does not apply to taxes and/or fees waived for subscribers with respect to California LifeLine

## 9. REPORTS AND CLAIMS FOR REIMBURSEMENT OF CALIFORNIA LIFELINE-RELATED COSTS

9.1 Eligible California LifeLine Service Providers.

 9.1.1 Any California LifeLine Service Provider that provides California LifeLine may submit a claim for the reimbursement of its California LifeLine-related costs and lost revenues.

9.2 Recoverable California LifeLine Costs and Lost Revenues.

 9.2.1 A California LifeLine Service Provider may recover from the California LifeLine Fund up to the SSA, California LifeLine non-recurring charges (Service Connection Charges, Service Conversion Charges, lost revenue from untimed calls associated with California LifeLine Measured Rate Service), applicable taxes/surcharges, interest (if applicable), one-time Implementation Costs, other amounts expressly delineated, and administrative expenses as set forth in Section 9.3.10, 9.3.12 and 9.3.13 of this General Order.

  9.2.1.1 From the effective date of D. 10-11-033 and up until December 31, 2012,

GO 153 (Effective December 1, 2011 – D. 10-11-033, Resolution T-17321)

Non-ETCs may collect amounts as set forth in Sections 9.3.4, 9.3.5 and 9.3.11.

9.2.2   From the effective date of D. 10-11-033 until December 31, 2012, California LifeLine Providers may claim additional support to cover higher rates in Extended Area Service territories.

9.3   California LifeLine Service Providers may recover the following costs and lost revenues from the California LifeLine Fund:

9.3.1   Lost revenues caused by providing subscribers with (i) California LifeLine Service Connection Charges, (ii) California LifeLine Service Conversion Charges, (iii) untimed calls relating to California LifeLine Measure Rate Service, (iv) California LifeLine service for separate households at a given physical address, and (v) California LifeLine service for a second TTY line under Section 4.2.3 not recoverable from the federal Lifeline program..

9.3.2   Each California LifeLine Service Provider with eligible California LifeLine subscribers will be paid  the portion of the SSA necessary to reimburse the carrier for discounts as specified in Section 8 of the GO provided to California LifeLine subscribers, whichever is lower and adjusted on its subscribers' bills on a per-subscriber basis based on the daily weighted-average customer counts supplied monthly by the California LifeLine Administrator.

9.3.2.1   The weighted average subscriber counts supplied to California LifeLine Service Providers will include prior month adjustments for pre-qualification back-credits and successful appeals.

9.3.2.2   Beginning January 1, 2013, there will be an assumed payment floor of $5.00 for California LifeLine Flat Rate Service and $2.50 for California LifeLine Measured Rate Service, in the calculation of the SSA recovery.

9.3.3   Until December 31, 2012, the EUCL charge (Tier 1), the federal basic rate subsidy (Tiers 2-3), and federal Link-Up support may be claimed by non-ETCs from the California LifeLine Fund.  After December 31, 2012, except as set forth in Section 9.3.3.1, California LifeLine Service Providers shall not claim these federal reimbursements from the California LifeLine Fund.

9.3.3.1   California LifeLine Service Providers may claim the EUCL charge (Tier 1), the federal basic rate subsidy (Tiers 2-3), and the federal Link-Up support from the California LifeLine Fund for a second California LifeLine line approved under Section 4.2.3.

9.3.4   The taxes, fees, and surcharges associated with the federal portion of the California LifeLine discount provided to California LifeLine subscribers.

9.3.5   The taxes, fees, and surcharges that a California LifeLine Service Provider pays on behalf of its California LifeLine subscribers.

9.3.5.1   The base for calculating the reimbursable amount of Federal Excise Tax (FET) shall include only the lost revenues from the following items: (a) Service Conversion Charges, (b) measured and/or flat rate service, (c) EUCL, (d)

surcharges, and (e) allowable recovery of untimed calls.  Service Connection Charges are exempted from the tax.  The following table summarizes how the federal excise tax must be calculated and reported on the California LifeLine Claim Form:

| Base for Federal Excise Tax |
| :---: |
| Service Conversion Charges |
| Measured Rate Service |
| Flat Rate Service |
| EUCL |
| Allowable Recovery Untimed Calls |
| Surcharges: |
| Bill & Keep/Other rate cases |

9.3.5.2    California LifeLine Service Providers shall not be reimbursed for Federal Excise Taxes unless such taxes and fees are calculated and reported in accordance with the above instructions.

9.3.5.3    If a California LifeLine Service Provider's actual liability for the taxes, fees, and surcharges that it pays on behalf of its California LifeLine subscribers differs from the amount that was previously reimbursed by the California LifeLine Fund, the California LifeLine Service Provider shall report the difference, whether positive or negative, as a true up on its California LifeLine Claim Form.

9.3.6    Interest and penalties assessed by taxing authorities that stem from the taxes, fees, and surcharges that the California LifeLine Service Providers pay on behalf of their California LifeLine subscribers.

9.3.6.1    Any interest and penalties that clearly stem from the negligence of the California LifeLine Service Provider shall not be reimbursed by the California LifeLine Fund.

9.3.6.2    CD may determine whether, and to what extent, the interest and penalties assessed by a taxing authority should be reimbursed by the California LifeLine Fund.

9.3.7    Administrative and interest costs incurred to provide deferred-payment schedules for California LifeLine Service Connection Charges.  Reimbursement for interest costs shall be based on (i) the Three-Month Commercial Paper Rate, and (ii) the assumption that all deferred payment are made on time.

9.3.8    Through December 31, 2012, the incremental costs incurred by a non-ETC California LifeLine Service Provider that is not eligible to be designated as an ETC to provide toll-limitation free of charge to its California LifeLine subscribers to the extent that such costs are not recovered from the federal Lifeline program.  All Non-ETC California LifeLine Service Providers shall determine their total incremental costs in the manner prescribed by the Federal Communications Commission.

GO 153 (Effective December 1, 2011 – D. 10-11-033, Resolution T-17321)

9.3.8.1    The California LifeLine Fund shall not reimburse a California LifeLine Service Provider for the regular rates of its Toll Limitation services included in its tariff or California LifeLine Schedule of Rates and Charges, as applicable.

9.3.9    A per-subscriber administrative cost reimbursement based on the lesser of actual expenses incurred or the set administrative support amount (initially $0.50 per subscriber).  This reimbursement rate is available to all California LifeLine Service Providers that provide their California LifeLine administrative cost information with their monthly claims.  Those California LifeLine Service Providers that do not submit administrative cost information will be reimbursed at a rate of the California LifeLine Service Provider with the lowest submitted administrative costs (initially $0.03 per subscriber).  These rates can be increased annually by no greater than the Consumer Price Index – Urban (CPI-U) rate.

9.3.10   The following costs shall be considered in calculating the California LifeLine Service Provider's actual expenses for California LifeLine administrative costs:

9.3.10.1    Demonstrably incremental costs should be reported as part of the claims disclosure.  These include costs associated with the time spent by California LifeLine Service Provider representatives to (i) notify residential customers about the availability of California LifeLine, (ii) ask residential customers if they are eligible to participate in the California LifeLine program, (iii) obtain verbal indication from residential customers regarding their eligibility to participate in the California LifeLine program, (iv) inform applicants that they must return the signed Application Form on or before the deadline date specified on the form, and (v) inform applicants of the yearly renewal requirement.

9.3.10.2    The incremental costs incurred by a California LifeLine Service Provider to develop, deploy, and operate systems and procedures associated with the provision of a second California LifeLine line to eligible households with a disabled member.

9.3.10.3    Costs associated with processing California LifeLine service orders and answering calls from subscribers regarding California LifeLine-related charges on their bill.  These costs may be recovered (up to the administrative cost support cap) to the extent that a California LifeLine Service Provider can affirmatively demonstrate that such costs meet all the criteria in Section 9.2.1.

9.3.10.4    Incremental administrative expenses listed on Line 8 of the worksheet for the California LifeLine's Claim Form set forth in Rule 9.5.1 below.

9.3.11   Each California LifeLine Service Provider shall claim up to the SSA, adjusted on its subscribers' bills, and all eligible federal support available to a single California LifeLine Line, for a second California LifeLine Line on a per-subscriber basis, based on the daily weighted-average subscriber count provided by the California LifeLine Administrator.

9.3.12   The incremental costs incurred by a California LifeLine Service Provider to implement

new reporting requirements ordered by the Commission in D. 05-04-026 and subsequent order(s).

9.4     California LifeLine Service Providers shall neither claim nor recover from the California LifeLine Fund any of the following costs and lost revenues:

9.4.1   Advertising, marketing, and outreach costs.

9.4.2   State 911 tax.

9.4.3   Costs associated with non-California LifeLine services and activities.

9.4.4   Costs caused by the failure of California LifeLine subscriber to timely remit deferred payments of the California LifeLine Service Connection Charge, including costs for collecting on delinquent accounts and the time value of money.  California LifeLine Service Providers may recoup such cost via late-payment fees charged to California LifeLine subscribers who fail to timely remit deferred payments of the California LifeLine Service Connection Charge, but only to the extent that such costs are not recovered by California LifeLine Service Providers from other sources, such as the bad-debt costs built into a California LifeLine Service Provider's general rates.

9.4.5   Lost revenues caused by the failure of California LifeLine subscribers to pay late-payment fees that the California LifeLine Service Provider assesses when California LifeLine subscribers fail to timely remit deferred payments of the California LifeLine Service Connection Charge.

9.4.6   Any costs or lost revenues associated with the provision of services that ETCs are required to provide under the federal Lifeline of Link-Up programs, but which California LifeLine Service Providers are not required to provide under California LifeLine.

9.4.7   Any costs or lost revenues that the California LifeLine Service Provider has recovered or will recover from other sources.

9.4.8   Any costs or lost revenues associated with the provision of non- LifeLine lines to California LifeLine subscribers.

9.4.9   Bad debt expenses (after November 30, 2011).

9.4.10  Administrative costs over and above those allowed under Section 9.3.11.  California LifeLine Service Providers operating under rate-of-return regulation may seek recovery in their general rate cases any additional California LifeLine-related administrative costs not reimbursed through the process outlined in the sections referenced above.

9.4.11  After December 31, 2012, costs claimable from the federal Lifeline/Link-Up program.

9.4.12  Translation expenses (unless specified by a Commission Decision) are considered "Customer Notification" administrative expenses and are reimbursed as part of the administrative cost factor.

9.5     Schedule, Content, and Format of the California LifeLine Report and Claim Form.

9.5.1   California LifeLine Service Providers shall report and claim their California LifeLine-related costs and lost revenues by filing the California LifeLine Program Report and Claim Form ("California LifeLine Claim Form").found at

GO 153 (Effective December 1, 2011 – D. 10-11-033, Resolution T-17321)

http://www.cpuc.ca.gov/PUC/Telco/Information+for+providing+service/FormNotices_Public+Program.htm.

    9.5.1.1   Claims must be accompanied by any supporting workpapers required by this General Order.

9.5.2   California LifeLine Service Providers with 100 or more subscribers shall file the California LifeLine Claim Form on a monthly basis no later than 60 days after the conclusion of the month during which service was provided.

9.5.3   Each California LifeLine Claim Form filed on a monthly basis shall be for a full month.

    9.5.3.1   California LifeLine Service Providers that file California LifeLine Claim Forms on a monthly basis must also remit California LifeLine surcharge revenues on a monthly basis.

9.5.4   California LifeLine Service Providers with less than 100 subscribers may request permission from CD to file their California LifeLine Claim Forms on a biannual basis no later than six months after the conclusion of the month during which service was provide.  The Commission and CD may specify and revise the conditions that carriers must meet in order to file their California LifeLine Claim Forms on a biannual basis.

    9.5.4.1   California LifeLine Service Providers filing California LifeLine Claim Forms on a biannual basis must show a monthly breakdown of their claims on the California LifeLine Claim Form.

    9.5.4.2   California LifeLine Service Providers shall not be paid interest on claims that are submitted on a biannual basis.

    9.5.4.3   California LifeLine Service Providers that report and remit California LifeLine surcharges on a biannual basis must file California LifeLine Claim Forms on a biannual basis.

9.5.5   California LifeLine Service Providers with more than 100 subscribers must submit their California LifeLine Claim Forms to CD no later than 60 days after the close of the monthly period for which a claim is made.

9.5.6   California LifeLine Service Providers with less than 100 subscribers must submit their California LifeLine Claim Forms to CD no later than 180 days after the close of the monthly period for which a claim is made.

9.6   Accessibility of California LifeLine Claim Information to the Public.

9.6.1   Each California LifeLine Service Provider shall make available upon request in its main California office copies of all California LifeLine Report and Claim Statements filed with the Commission in compliance with these rules.

9.7   Review and Approval of Claims.

9.7.1   California LifeLine Service Providers shall submit California LifeLine claims to CD for review and determination of whether, and to what extent, California LifeLine claims should be paid.  CD shall prepare payment letters for all approved claims.

    9.7.1.1   Claims submitted without proper supporting workpapers will be rejected.

9.7.1.2   The California LifeLine Service Provider will be provided an explanation for the rejection of all or part of a claim.

9.7.1.3   Any uncontested portions of the claim will be authorized for payment.  Should it later be determined that all or a part of the contested portion of a claim was valid, the valid portion of the claims shall be paid with interest at the Three-Month Commercial Paper Rate.

9.8   Payment of Claims.

9.8.1   Claims shall be paid in accordance with §270(c) of the Public Utilities Code and Section 9.7.1 of this General Order.

9.8.2   No payment of claims will be made for any claims received after the due date (see Sections 9.5.2 and 9.5.4).

9.8.3   No payment will be made to a California LifeLine Service Provider if there is not a sufficient amount in the California LifeLine Fund to pay approved claims.

9.8.4   No payment will be made to a California LifeLine Service Provider to pay approved claims if the appropriation in the State's Annual Budget Act for the California LifeLine Fund is exhausted.

9.8.5   No payment will be made to a California LifeLine Service Provider that has not accurately reported or failed to report its California LifeLine surcharge revenues.

9.8.6   No payment will be made to a California LifeLine Service Provider until all California LifeLine surcharge revenues due from the California LifeLine Service Provider are remitted in full, along with interest on the late remittance based on an annual rate of 10%.

9.8.7   If CD determines there is an overpayment of California LifeLine claims, CD shall take all appropriate actions, which may include but is not limited to (i) adjusting the overpayment against the current claim, (ii) offsetting the overpayment against future California Lifeline claims; iii) making payment arrangements with the California LifeLine Service Provider, or (iv) any other reasonable arrangement with the California LifeLine Service Provider to ensure that the California LifeLine Service Provider properly reimburses the California LifeLine Fund for the overpayment of California LifeLine claims.

9.8.8   If a subscriber has his or her service disconnected or if a California LifeLine Service Provider is informed by the subscriber that the subscriber is no longer participating in California LifeLine and the California LifeLine Service Provider fails to remove the subscriber from California LifeLine and/or notify the California Lifeline Administrator, the Commission may reduce California LifeLine claim payments to the California LifeLine Service Provider attributed to that subscriber.

9.9   Interest on Claims.

9.9.1   The California LifeLine Fund shall pay interest to California LifeLine Service Providers on monthly California LifeLine claims that are both timely and legitimate if such claims are not paid 60 days after the due date for California LifeLine Service Providers to submit their claims.  The interest paid to California LifeLine Service

GO 153 (Effective December 1, 2011 – D. 10-11-033, Resolution T-17321)

Providers shall be at the Three-Month Commercial Paper Rate.

    9.9.1.1   Accrual of interest shall commence on the 60th day after the claim was due to be submitted and end on the date that payment is made to the California LifeLine Service Provider.

9.9.2   No interest shall be paid on (i) claims that are not submitted by the due date, (ii) claims that are incomplete or lack supporting documentation, (iii) claim payments that are withheld from a California LifeLine Service Provider due to a California LifeLine Service Provider's failure to timely report or remit California LifeLine surcharge revenues, (iv) claim payments that are withheld due to overpayment of California LifeLine claim, or (v) on amounts as directed by any court of competent jurisdiction.

9.10   Time Limits for Submitting Initial Claims and True-up Claims.

9.10.1   California LifeLine Service Providers shall not be reimbursed for California LifeLine claims that are filed after the due date (See Sections 9.5.2 and 9.5.4).

9.10.2   California LifeLine Service Providers that submit a timely claim shall have one year from the deadline for submitting the initial claim to submit a true-up claim.  True-up claims shall not be paid if they are submitted more than one year from the deadline for submitting initial claims.

9.10.3   Interest shall be paid to, or received from, California LifeLine Service Providers that submit timely true-up claims, from the date of the period being claimed.  The rate of interest on true-up claims shall be based on the Three-Month Commercial Paper Rate.

    9.10.3.1   Accrual of interest shall commence on the 60th day after the initial claim was due to be submitted and end on the date that the "true-up" payment is made to, or received from, the California LifeLine Service Provider.

9.11   Obligation to Support and Justify Claimed Costs and Lost Revenues.

9.11.1   California LifeLine Service Providers have the burden of supporting and justifying any costs and lost revenues that they seek to recover from the California LifeLine Fund.

9.11.2   CD may require California LifeLine Service Providers to submit workpapers, documents, and other information to support their California LifeLine claims.  CD may promulgate standards regarding the format, content, and timing of workpapers in accordance with the procedures set forth in this General Order for promulgating administrative revisions to the California LifeLine Program.

9.11.3   California LifeLine Service Providers shall provide to the Commission or CD within 10 business days, upon request, documents, workpapers, records (to the extent that records exist) and other information regarding costs and lost revenues claimed by the California LifeLine Service Provider.  Failure to provide information requested by the Commission or CD is reasonable grounds to deny costs and lost revenues claimed by the California LifeLine Service Provider.

9.12   Carriers of Last Resort (COLRs).

9.12.1   COLRs may draw financial support from the CHCF-B for a second California LifeLine line provided to low-income subscriber in designated high cost areas of the State.  The amount that a COLR may draw from the CHCF-B for the second California LifeLine

line provided to a particular California LifeLine subscriber shall be governed by the same terms and conditions that apply to the COLR's draws from the CHCF-B for the first California LifeLine line provided to the subscriber.

9.12.2 CD may require COLRs to submit workpapers and other information to support their CHCF-B claims for second LifeLine lines. Failure to provide information requested by CD is reasonable grounds to deny recovery from the CHCF-B of amounts claimed by the COLR.

## 10. CALIFORNIA LIFELINE SURCHARGE RATE & SURCHARGE BILLING BASE

10.1 All California LifeLine Service Providers and Non-Traditional Providers shall assess, collect, and remit public purpose program surcharge on revenues from end user Intrastate Telecommunications Services. For carriers required to file tariffs, they must include the requirement to collect the state surcharges in their tariffs.

10.2 The current California LifeLine surcharge rate is set forth in the Combined California PUC Telephone Surcharge Transmittal Form ("Surcharge Transmittal Form") that is available on the Commission's website (http://www.cpuc.ca.gov/PUC/telco/)

10.3 The Commission shall set the California LifeLine surcharge rate based on the forecast of revenues subject to the surcharge and the funding requirements for the provision of LifeLine to subscribers, including LifeLine marketing costs and program administrative costs.

10.3.1 Effective July 1, 2001, the California LifeLine surcharge rate will be annually revised, if necessary, on July 1st of each year.

10.4 Schedule for Filing Revenues and Expense Forecasts.

10.4.1 Each carrier shall annually submit to CD an estimate of the carrier's projected gross revenues subject to the California LifeLine surcharge for the following year.

10.4.2 Each California LifeLine Service Provider shall annually submit to CD a forecast of the California LifeLine Service Provider's California LifeLine claims for the following year.

10.4.3 On or before June 1 of each year, the ULTS-AC shall submit a proposed budget to CD. The proposed budget shall include estimated program expenditures and the Committee's projected expenses for the fiscal year (July 1 to June 30) that will commence thirteen (13) months thereafter.

10.4.4 CD's resolution adopting the revised California LifeLine surcharge rate may also adopt an annual budget for the California LifeLine Fund.

10.5 Surcharge Revenue Base.

10.5.1 All end-user intrastate telecommunications services, whether tariffed or not, are subject to the California LifeLine surcharge, except for the following services:

10.5.1.1 California LifeLine billings.

10.5.1.2 Charges to other certificated carriers or Non-Traditional Providers for services that are to be resold.

GO 153 (Effective December 1, 2011 – D. 10-11-033, Resolution T-17321)

10.5.1.3   Coin sent paid telephone calls (coin in box) and debit card calls.

10.5.1.4   Usage charges for coin-operated pay telephones.

10.5.1.5   Customer-specific contracts effective before September 15, 1994.

10.5.1.6   Directory advertising.

10.5.1.7   One-way radio paging.

## 11. REPORTING AND REMITTANCE OF SURCHARGES

11.1   Surcharge Transmittal Form.

11.1.1   Every carrier shall report and remit California LifeLine surcharge revenues electronically at: http://www.cpuc.ca.gov/PUC/Telco/Information+for+providing+service/Surcharge+Remittance.htm.

11.2   Surcharge Remittance Schedule and Procedures.

11.2.1   Carriers shall report and remit California LifeLine surcharge revenues on a monthly basis in accordance with the instructions attached to the Surcharge Transmittal Form (STF).  A sample copy of the STF and the instructions attached to the STF are available as one document on the Commission's website: http://www.cpuc.ca.gov/puc/telco.

11.2.2   Carriers may seek authority to submit the STF and remit California LifeLine surcharge revenues on a biannual basis in accordance with the instructions attached to the STF. Entities that are granted such authority shall submit the STF and remit LifeLine surcharge revenues in accordance with the instructions in the STF.

11.3   Method for Remitting and Reporting Surcharge Revenues.

11.3.1   Carriers shall report and remit their California LifeLine surcharge revenues based on intrastate end-user billings less estimated uncollectible amounts.  Carriers shall true-up their estimated California LifeLine surcharge uncollectible amounts with their actual uncollectible amounts.

11.4   Interests on Late Surcharge Remittances.

11.4.1   Carriers that are late in remitting their California LifeLine surcharge revenues shall pay interest on the late remittances equal to an interest rate of 10%.  Interest shall accrue beginning on the date the remittance are due and ending on the date that the surcharge revenues are remitted.

11.5   Warning Notices on Late Surcharge Remittances.

11.5.1   CD shall send two written notices to any California LifeLine Service Provider that is late in remitting California LifeLine surcharge revenues.  The notices shall warn the California LifeLine Service Provider that it will lose its Certificate of Public Convenience and Necessity if it fails to remit past-due surcharge revenues and associated interest.

11.6   Reporting of Surcharge Over/Under Collection or Remittance.

11.6.1   Each carrier shall report any under or over collection of the California LifeLine surcharge as soon as it becomes known to the carrier.  Each carrier shall report any under or over remittance of California LifeLine surcharge monies as soon as it becomes known to the carrier.

11.7   Surcharge Workpapers.

11.7.1   CD may require carriers to submit workpapers, documents, and other information to support their surcharge remittances. CD may promulgate standards regarding the format, content, and timing of workpapers in accordance with the procedures set forth in this General Order for promulgating administrative revisions to the California LifeLine program.

11.7.2   Carriers shall provide to the Commission or CD, upon request, documents, workpapers, records (to the extent that records exist) and other information regarding their surcharge remittances.

## 12. USE OF ELECTRONIC COMMUNICATIONS

12.1   The Commission's website may be used as a means to provide California LifeLine Service Providers, carriers, and other parties with access to information regarding California LifeLine. Such information may include: this General Order, Commission decisions, resolutions, rulings, staff reports, letters, and other documents pertinent to California LifeLine.

12.2   California LifeLine applicants and subscribers also have the option of completing their application (program-based only) or renewing their continued eligibility via the California LifeLine interactive website, which can be found at the following address: http://www.californialifeline.com  Access requires a Personal Identification Number (PIN) found on the Application/Renewal Forms sent by the California LifeLine Administrator.

12.3   CD may provide notice to California LifeLine Service Providers, carriers, and other parties of important matters regarding California LifeLine by e-mail that (i) briefly describe the matter being noticed, (ii) provide information on how to obtain more detailed information and/or documents regarding the matter being noticed from the Commission's website, and (iii) the phone number of a contact person from whom the information and/or documents can be obtained.

12.3.1   When appropriate, notice of matters pertaining to California LifeLine may be combined with notices pertaining to other public programs, such as the CHCF-B and DDTP.

## 13. AUDITS AND RECORDS

13.1   The Commission, Commission staff, and agents of the Commission may audit carrier's remittance of California LifeLine surcharge revenues and California LifeLine Service Providers' California LifeLine claims.

13.2   The scope of audits shall be limited to five calendar years following the calendar year in which California LifeLine surcharge revenues are remitted or California LifeLine claims submitted,

except in cases where there appears to be malfeasance, such as gross waste, fraud, or abuse. Where there is an indication of malfeasance, the scope of the audit will depend on the law and circumstances existing at that time.

13.3  CD shall authorize the LifeLine Fund to promptly reimburse a California LifeLine Service Provider for the underpayment of California LifeLine claims found by a Commission audit. Any underpayment of California LifeLine claims found by an audit shall accrue interest based on the Three-Month Commercial Paper Rate.

13.3.1  If the audited entity believes that the amount of reimbursement is too little, the California LifeLine Service Provider may file an application with the Commission to seek additional reimbursement.  Any additional reimbursement awarded by the Commission shall accrue interest based on the Three-Month Commercial Paper Rate.

13.4  California LifeLine Service Providers that promptly reimburse the California LifeLine Fund for an overpayment of California LifeLine claims found by a Commission audit shall pay interest on the amount of overpayment based on the Three-Month Commercial Paper Rate, unless there is malfeasance on the part of the such entity, in which case the rate of interest shall depend on the law and circumstances existing at the time the malfeasance is discovered.

13.5  CD shall authorize the California LifeLine Fund to promptly reimburse a carrier for the over-remittance of California LifeLine surcharge revenues found by a Commission audit.  Any over-remittance of California LifeLine surcharge revenues found by an audit shall accrue interest based on the Three-Month Commercial Paper Rate.

13.5.1  If the audited entity believes that the amount of reimbursement is too little, the carrier may file an application with the Commission to seek additional reimbursement.  Any additional reimbursement awarded by the Commission shall accrue interest based on the Three-Month Commercial Paper Rate.

13.6  Any under-remittance of California LifeLine surcharge revenues found by a Commission audit shall accrue interest at a 10% annual rate, unless the under-remittance is due to the audited entity's malfeasance, in which case, the rate of interest shall depend on the law and circumstances existing at the time the malfeasance are discovered.

13.7  If a California LifeLine Service Provider does not promptly reimburse the California LifeLine Fund for an overpayment of California LifeLine claims or an under-remittance of California LifeLine surcharge revenues that is discovered by an audit, then the Commission's Consumer Services and Information Division shall prepare an order instituting investigation (OII) on whether the entity should be required to reimburse the California LifeLine Fund for some or all of the amount identified in the audit.

13.7.1  Any amount that a California LifeLine Service Provider is found to owe to the California LifeLine Fund as a result of the OII shall accrue interest based on the Three-Month Commercial Paper Rate, unless the amount owed is due to negligence or malfeasance, in which case the rate of interest shall depend on (i) the circumstances, and (ii) the law existing at the time the negligence or malfeasance is discovered.

13.8  Carriers shall retain all records related to California LifeLine surcharge remittances for a period of five calendar years following the year in which the surcharges are remitted, unless all or part of such records must be kept for a longer period of time pursuant to requirements

promulgated elsewhere (e.g., record-retention requirements set forth in the uniform system of accounts).  The records that all carriers must retain for five calendar years include all records pertaining to intrastate billings and collections.

13.9   California LifeLine Service Providers shall retain all records related to a California LifeLine claim, including a true-up claim, for a period of five calendar years following the year in which the California LifeLine claim or true up claim is submitted, unless all or part of such records must be kept for a longer period of time pursuant to requirements promulgated elsewhere (e.g., record-retention requirements set forth in the uniform system of accounts).  The records that California LifeLine Service Providers (or the California LifeLine Administrator) must retain for five calendar years include (i) Application and Renewal Forms, (ii) California LifeLine Claim Forms and workpapers supporting the claim forms, and (iii) other documents and information on which the California LifeLine Claim Forms and workpapers are based.


## 14. REQUESTS FOR WAIVER OF CALIFORNIA LIFELINE ADMINISTRATIVE REQUIREMENTS

14.1   California LifeLine Service Providers may request a waiver of any administrative requirement set forth in this General Order, including the administrative requirements pertaining to (i) the schedule, format, and content of workpapers that California LifeLine Service Providers must submit to support their California LifeLine claims, and (ii) the time limit for submitting California LifeLine claims.

14.2   California LifeLine Service Providers may request a waiver by submitting a written waiver request to the Director of the CD.  The request must provide a thorough explanation for why the waiver is necessary.

14.3   CD may attach conditions when granting a waiver request.

14.4   If a waiver involves the payment of money to or from a California LifeLine Service Provider, CD may determine what rate of interest, if any, should apply to the payment(s) subject to the waiver.


## 15. FUTURE REVISIONS TO THIS GENERAL ORDER

This General Order shall be continuously updated and revised to reflect the future needs of, and changes to, California LifeLine in accordance with the Commission's orders and resolutions.

General Order 153
Appendix A
Service Elements of California LifeLine

California LifeLine is composed of the service elements set forth below.  All California
LifeLine subscribers are entitled to receive every one of the service elements of
California LifeLine, and every California LifeLine Service Provider is required to offer
all of the service elements of California LifeLine to each of its subscribers.  The service
elements of California LifeLine are as follows:

1   Access to (a) single party local exchange service, or (b) service that is equivalent,
    in all substantial respects, to single party local exchange service.

2   Access to all interexchange carriers offering service in the California LifeLine
    subscriber's local exchange.

3   Ability to place calls.

4   Ability to receive free unlimited incoming calls.

5   Free touch-tone dialing.

6   Free unlimited access to 911/E-911.

7   Access to local directory assistance (DA).  Each California LifeLine Service
    Provider shall offer to its subscribers the same number of free DA calls that the
    California LifeLine Service Provider provides to its non- California LifeLine
    residential customers.

8   Access to foreign Numbering Plan Areas.

9   California LifeLine rates and charges.

10  Customer choice of local Flat-Rate Service or Measured-Rate Service.  The 14
    small ILECs identified in D. 96-10-066 do not have to offer subscribers the choice
    of local Flat or Measured-Rate Service, unless the small ILEC offers this option to
    its non- California LifeLine residential customers.

11  Free provision of one directory listing per year as provided for in D. 96-02-072.

12  Free white pages telephone directory.

13  Access to operator service.

14  Voice grade connection to the public switched telephone network.

15  Free access to 800 or 800-like toll-free services.

16  Access to telephone relay services as provided for in Public Utilities Code §2881
    et seq.

17  Toll-free access to customer service for information about California LifeLine,
    service activation, service termination, service repair, and bill inquiries.

18  Toll-free access to customer service representatives fluent in the same language
    (English and non-English) in which California LifeLine was originally sold.

GO 153 (Effective December 1, 2011 – D. 10-11-033, Resolution T-17321)

19      Free access to Toll-Blocking Service.

20      Free access to Toll-Control Service, but only if (i) the California LifeLine Service Provider is capable of offering Toll-Control Service, and (ii) the California LifeLine subscriber has no unpaid bill for toll service.

21      Access to two residential telephone lines if a low-income household with a disabled person requires both lines to access California LifeLine.

22      Free access to the California Relay Service via the 711 abbreviated dialing code.

# EXHIBIT H




**Earnings Statement**

6S8    011262    007038            0000170049    1

SAGE TELECOM, INC.
10440 N. CENTRAL EXPRESSWAY SUITE 700
DALLAS,TX 75231-2228
COMPANY PH# 214-495-4700

| Period Beginning: | 04/24/2016 |
| Period Ending: | 04/30/2016 |
| Pay Date: | 04/29/2016 |

Taxable Marital Status:    Single
Exemptions/Allowances:
   Federal:        1,$10 Additional Tax
   TX:             No State Income Tax

**CHRISTIAN GONZALES**

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Regular | 1937.50 | 86.67 | 1,937.50 | 15,500.00 |
| Bereavement | | 24.00 | | |
| Personal | | 4.00 | | |
| **Gross Pay** | | | **$1,937.50** | 15,500.00 |

| Other Benefits and Information | this period | total to date |
|---|---|---|
| 401Ker | 2.50 | 20.00 |
| Pto Bal | | 86.72 |

| Deductions | Statutory | | |
|---|---|---|---|
| | Federal Income Tax | -199.93 | 1,599.44 |
| | Social Security Tax | -104.31 | 834.50 |
| | Medicare Tax | -24.40 | 195.17 |
| | **Other** | | |
| | Base Plan | -247.07* | 1,976.56 |
| | Dental Hmo Plan | -5.84* | 46.72 |
| | Short Term Dis | -2.13* | 17.04 |
| | 401K Plan | -25.00* | 200.00 |
| | **Net Pay** | **$1,328.82** | |
| | Checking | -1,328.82 | |
| | **Net Check** | **$0.00** | |

**\* Excluded from federal taxable wages**

Your federal taxable wages this period are
$1,657.46

© 2000 ADP, LLC

SAGE TELECOM, INC.
10440 N. CENTRAL EXPRESSWAY SUITE 700
DALLAS, TX 75231-2228
COMPANY PH# 214-495-4700

| Advice number: | 00000170049 |
|---|---|
| Pay date: | 04/29/2016 |



| Deposited to the account of | account number | transit ABA | amount |
|---|---|---|---|
| CHRISTIAN GONZALES | xxxxxx3848 | xxxx xxxx | $1,328.82 |

**NON-NEGOTIABLE**

**6S8**  011262 007038  0000220065 1

# Earnings Statement



SAGE TELECOM, INC.
10440 N. CENTRAL EXPRESSWAY SUITE 700
DALLAS, TX 75231-2228
COMPANY PH# 214-495-4700

| | |
|---|---|
| Period Beginning: | 05/16/2015 |
| Period Ending: | 05/31/2015 |
| Pay Date: | 05/29/2015 |

Taxable Marital Status: Single
Exemptions/Allowances:
  Federal:   1,$10 Additional Tax
  TX:       No State Income Tax

**CHRISTIAN GONZALES**

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Regular | 1937.50 | | 1,937.50 | 19,375.00 |
| Holiday | | 8.00 | | |
| Pto Cash Out | | | | 1,487.83 |
| **Gross Pay** | | | **$1,937.50** | 20,862.83 |

| Other Benefits and Information | this period | total to date |
|---|---|---|
| 401Ker | 2.50 | 25.00 |
| Pto Bal | | 76.40 |

| Deductions | | this period | year to date |
|---|---|---|---|
| **Statutory** | | | |
| Federal Income Tax | | -203.69 | 2,394.76 |
| Social Security Tax | | -105.82 | 1,150.50 |
| Medicare Tax | | -24.75 | 269.07 |
| **Other** | | | |
| Base Plan | | -222.99* | 2,229.90 |
| Dental Hmo Plan | | -5.51* | 55.10 |
| Short Term Dis | | -2.13* | 21.30 |
| 401K Plan | | -25.00* | 250.00 |
| **Net Pay** | | **$1,347.61** | |
| Checking | | -1,347.61 | |
| **Net Check** | | **$0.00** | |

**\* Excluded from federal taxable wages**

Your federal taxable wages this period are
$1,681.87

© 2000 ADP, LLC

SAGE TELECOM, INC.
10440 N. CENTRAL EXPRESSWAY SUITE 700
DALLAS, TX 75231-2228
COMPANY PH# 214-495-4700

| Advice number: | 00000220065 |
|---|---|
| Pay date: | 05/29/2015 |

THIS IS NOT A CHECK

| Deposited to the account of | account number | transit ABA | amount |
|---|---|---|---|
| **CHRISTIAN GONZALES** | xxxxxx3848 | xxxx xxxx | $1,347.61 |

# NON-NEGOTIABLE

# EXHIBIT I

**From:** Shubert,Michelle M <[MSHUBERT@travelers.com](mailto:MSHUBERT@travelers.com)>
**Sent:** Monday, November 28, 2016 1:45 PM
**To:** Nathaniel Law <[NLaw@truconnect.com](mailto:NLaw@truconnect.com)>
**Subject:** RE: Audit Dispute - TSC Acquisition Corporation, UB-4f128033, 12/31/14 - 12/31/15

Yes but I do not have access to billing.
Their number is 800-252-2268.

**Michelle Shubert | Resolution Specialist | Premium Audit**
Travelers
P.O. Box 2927
Hartford CT 06104-2927
W: 800-842-4271 x3001104   F: 855-572-1851



**From:** Nathaniel Law [[mailto:NLaw@truconnect.com](mailto:NLaw@truconnect.com)]
**Sent:** Monday, November 28, 2016 3:03 PM
**To:** Shubert,Michelle M <[MSHUBERT@travelers.com](mailto:MSHUBERT@travelers.com)>
**Subject:** RE: Audit Dispute - TSC Acquisition Corporation, UB-4f128033, 12/31/14 - 12/31/15

Thank you, Michelle.

Do you know if I will be receiving a revised bill for the true up?

**From:** Shubert,Michelle M [[mailto:MSHUBERT@travelers.com](mailto:MSHUBERT@travelers.com)]
**Sent:** Monday, November 28, 2016 9:35 AM
**To:** Nathaniel Law <[NLaw@truconnect.com](mailto:NLaw@truconnect.com)>
**Subject:** RE: Audit Dispute - TSC Acquisition Corporation, UB-4f128033, 12/31/14 - 12/31/15

Revised audit is attached.

**Michelle Shubert | Resolution Specialist | Premium Audit**
Travelers
P.O. Box 2927
Hartford CT 06104-2927
W: 800-842-4271 x3001104   F: 855-572-1851



**From:** Nathaniel Law [[mailto:NLaw@truconnect.com](mailto:NLaw@truconnect.com)]
**Sent:** Friday, November 25, 2016 10:55 AM
**To:** Shubert,Michelle M <[MSHUBERT@travelers.com](mailto:MSHUBERT@travelers.com)>
**Subject:** RE: Audit Dispute - TSC Acquisition Corporation, UB-4f128033, 12/31/14 - 12/31/15

Thank you, Michelle. Are you able to advise me of the revised premium amount?

---

**From:** Shubert,Michelle M [mailto:MSHUBERT@travelers.com]
**Sent:** Wednesday, November 23, 2016 11:16 AM
**To:** Nathaniel Law <NLaw@truconnect.com>
**Subject:** RE: Audit Dispute - TSC Acquisition Corporation, UB-4f128033, 12/31/14 - 12/31/15

Revision of the audit is underway and you will receive a revised Premium Adjustment Notice when processing is complete. All employees except Jeannette Aguilar have been moved to the clerical class as requested. Jeannette remains due to her store exposure.

In the interim, please feel free to contact me if you have any questions or require additional information. We appreciate the opportunity to do business with you.

Sincerely,

**Michelle Shubert | Resolution Specialist | Premium Audit**
Travelers
P.O. Box 2927
Hartford CT 06104-2927
W: 800-842-4271 x3001104   F: 855-572-1851



---

**From:** Nathaniel Law [mailto:nlaw@truconnect.com]
**Sent:** Friday, November 04, 2016 10:29 AM
**To:** auditdispute <auditdispute@travelers.com>
**Subject:** RE: Audit Dispute - TSC Acquisition Corporation, UB-4f128033, 12/31/14 - 12/31/15

Hello,

Please see the below for the dispute information:

Aguilar, Jeannette is incorrectly classified as Class 8017. Although her title is Director of Retail Sales, she is actually headquartered in the Corporate Office and should be categorized as class 8810. Her job duties are to manage and oversee all of the regional store managers in CA and in TX. She is based in the downtown Los Angeles office of the company, and visits the retail stores from time to time, but primarily remains located centrally in the corporate headquarters in Los Angeles.

Aguilar, Juan is incorrectly classified as Class 8017. Mr. Aguilar's title is a provisioner, and as a provisioner, his job duties were to provide administrative support in the corporate office by interacting with the underlying carriers of the company (the company operates as an MVNO of wireless

2

telecommunications carriers) to ensure that consumer's wireless phones are accurately functioning on the underlying carrier's network. This includes troubleshooting with the carrier over the phone from the corporate office, where this position was located, to ensure smooth operations for the wireless phones purchased or provided to our customers.

Contreras, Eva, and Martinez, Lissette are incorrectly classified as Class 8017. As a fulfillment clerk, this position was based in the company's corporate offices to assist with completing drop shipped orders sent to master agents or to customers. This is not a retail sales associate position and is not located in a retail store of the company.

Duran, Jorge is incorrectly classified as Class 8017. Jorge is based from the company's corporate offices in Los Angeles, and provides support to the retail stores of the company. He is not based or located at any of the company's retail stores.

Spence, Timothy John is listed as 8742 – outside salesperson, but Mr. Spence should have been categorized as 8810. As VP of Sales, he was a senior executive based out of the company's Los Angeles corporate office. He managed and oversaw the channel and retail sales of the company. He did not travel outside of the company's headquarters and perform any services as an outside salesperson.

Yang, Richard is categorized as 7600-12. However, he is an IT technician based out of the Los Angeles corporate office. He provides help desk and installation of software services for the company's corporate office.

Please let me know if you need any additional information on the foregoing or if you have any questions.

I understand that we have a payment that is due today based on this audit, but in light of the corrections we believe are necessary above, kindly advise if we can receive an updated audit amount and arrange for a payment plan to ensure that any remaining payment is paid timely to Travelers.

Thank you,
Nate

---

**From:** auditdispute [mailto:auditdispute@travelers.com]
**Sent:** Wednesday, September 14, 2016 7:14 AM
**To:** Nathaniel Law <nlaw@truconnect.com>
**Subject:** RE: Audit Dispute - TSC Acquisition Corporation, UB-4f128033, 12/31/14 - 12/31/15

Nate:

In order to start dispute process, we will need to see specifics to what is being disputed. If you are disputing payroll amounts, then we will need to know which payrolls are in question, along with complete payroll records, to backup any changes. If you are disputing classifications, then we will need to know which employees are in question, along with specific job duties for each person in question. Please submit dispute information to us, either by fax to 855-500-0151, or by email to auditdispute@travelers.com. A copy of audit worksheets were previously sent to you via email. If you have any further audit questions, please call us at 800-842-4271.

Thank you,

**Dispute Resolution Specialist | Premium Audit**
Travelers
PO Box 2927

Hartford, CT 06104-2927
W: 800.842.4271  F: 855.500.0151



 *Please consider the environment before printing.*

*We value your business, and appreciate and encourage your feedback regarding the service that you received. Please e-mail your comments to Pamela Portier at* **PPortier@Travelers.com.**

---

**From:** Nathaniel Law [mailto:nlaw@truconnect.com]
**Sent:** Tuesday, September 13, 2016 6:45 PM
**To:** auditdispute <auditdispute@travelers.com>
**Subject:** Audit Dispute - TSC Acquisition Corporation, UB-4f128033, 12/31/14 - 12/31/15

To Whom it May Concern:

Please be advised that we hereby dispute the audit results for the above-referenced audit for the Customer/Insured Name listed above.

We believe that some of the reclassifications of the employees was incorrectly applied. Specifically, there were some individuals who the auditor moved to class code 8017 that should not have been moved to that class, and others who we believe were inappropriately classified as 8742 rather than 8810.

I am happy to discuss the specifics of this with a dispute specialist to ensure that this is corrected (including providing the specific examples of what we believe are misclassifications by the auditor). However, I do not want to provide this over this unsecure email and would prefer that this be discussed with documentation to follow via secured method.

Please advise who I should speak to in order to address these issues.

Regards,
Nate

*Nate Law*
*General Counsel*
*TruConnect*
*(213) 379-5144 |* nlaw@truconnect.com
www.truconnect.com



---

This communication, including attachments, is confidential, may be subject to legal privileges, and is intended for the sole use of the addressee. Any use, duplication, disclosure or dissemination of this communication, other than by the addressee, is prohibited. If you have received this communication in error, please notify the sender immediately and delete or destroy this communication and all copies.